1816.

Tilghman
vs
Steuart

have supported a suit; but if he was only liable as administrator *de bonis non*, then the suit could not be maintained.

---

JUNE.

TILGHMAN, *et al.* vs. STEUART, *et al.*

A paper purporting to be the last will and testament of D S wholly in his own hand writing, and having his name written at the beginning, devising and bequeathing both real and personal estate to his brothers, nephews and nieces, &c. leaving blanks for their names, and appointing by names his two brothers and a nephew his executors, leaving also the day, month and year, in blank, with a formal seal affixed, and having the form of an attestation used to wills devising real estate, with three crosses opposite to where witnesses are accustomed to sign their names, was found, after the death of D S, in an envelope of white paper, having written on it at the top, in the handwriting of D S, words corresponding with the concluding words of the will, and which appeared to be a part of the draft from which the will was copied, deposited at the bottom of a bundle of certificates of bank stock to a large amount, in a locked trunk, a place of great security, and containing a considerable sum of money, besides many valuable papers, and none but papers of importance. It was proved that D S had always been a man of intelligence and information, and well acquainted with the manner and form of making wills, and also acquainted with the names of his brothers and sisters, and of his nephews and nieces, and with all his family and connexions. That in recent conversations he had said, that he was prepared with a will and had made it a point always to have a will by him. Bank stock had been purchased for him, by his directions, but had not been transferred to him, and it was not mentioned in the will, nor was there any general residuary clause therein by which that stock would pass The orphans court decreed that this paper be admitted to probate as the will and testament of D S, as to his personal estate. On appeal, *reversed.*

APPEAL from a decree of the orphans court of *Anne-Arundel* county, admitting to probate a paper purporting to be the last will of *David Steuart*, of *Doden*. The facts of the case appear to be, that *D. Steuart*, being possessed of a large real and personal estate, died on the 11th of October 1814, having never had but three sisters, all of whom died many years ago, and only one of whom left any children, viz *Susan*, who intermarried with *James Tilghman*; and having never had but four brothers, viz. *George Hume Steuart, Charles Steuart, William Steuart*, and *James Steuart*. That *Susan Tilghman*, at the time of

her death, left *Frisby Tilghman* and *Susan Holliday*, her only children and distributees. That *George Hume Steuart* died many years ago in *Scotland*, in the kingdom of *Great Britain*, leaving by marriage only one daughter, who also died many years ago, leaving by marriage two sons alive, as it is believed, at the death of *David Steuart*. That *Charles Steuart* died many years ago, leaving by marriage four sons alive at the death of *David Steuart*, viz. *George C. Steuart*, *Benedict Steuart*, *Charles Steuart*, and *Edward H. Steuart*, his only children and distributees. That *William Steuart* is still living, never having been married, and that *James Steuart* is also living, having married many years ago, and has now, and has had for several years, two sons, *George H. Steuart*, and *Richard S. Steuart*, and four daughters, *Margaret Steuart*, *Sophia Steuart*, *Henrietta Steuart*, and *Elizabeth Steuart*. That after the death of *David Steuart* a search was made among his papers, in the presence of many of his relatives, for the purpose of finding a will, and after searching in vain in other places, the two persons making the search unlocked a trunk, where the deceased was known to keep his money and most valuable papers, and there found, at the bottom of a bundle of bank certificates of stock, a paper purporting to be his will and testament, neatly and carefully enveloped in a cover of white paper, whereon are written words corresponding with the concluding words of the will and testament inclosed, and which appeared to be a small part of the draft from which the said will and testament was copied. That the trunk was a place of great security, and contained a considerable sum of money, besides many valuable papers, among which was certificates of bank stock to a large amount, and none but papers of importance. The paper thus found, purporting to be the will of the deceased, was lodged in the office of the register of wills for *Anne-Arundel* county, with the envelope of the said paper, on the 20th of October 1814. The paper and envelope are in the following words: "In the name of God, Amen. I *David Steuart* of *Doden*, in *Anne Arundel* county, and state of *Maryland*, being in perfect health, and of sound and disposing mind, do make and publish this my last will and testament, in manner and form following, viz. I give and bequeath unto my brother ———, the dividends of stock of the *Farmers Bank of Maryland*, standing in my name, also the use of my four negroes *Hannah*, *Jeanie*, *Paul* and *Charles*, during his natural life, after which my will is that they should be free; I also leave him my books, plate and furniture, I may be entitled to at my mother's death. *Item*. I bequeath unto my brother ———, the dividends of stock standing in my name in the *Bank of Maryland* and *Bank of Baltimore*. *Item*. I give to my nephew ———, his heirs and assigns, my two tracts of land, the one called *Venture*, the other *Edinbourgh*, lying in the county of *Washington*, also the stock of the *Frederick and Baltimore Turnpike* standing in my

1816.

Tilghman
vs
Steuart

name, and to each of his children I leave two negro children, a boy and a girl, from four to ten years of age. *Item.* I give to my niece —— the stock of the *Potomack Bridge Company* standing in my name. *Item.* I give to the sons of my brother —— any claim I may have against their father's estate. *Item.* To the grand children of my brother ——, I bequeath five thousand dollars each, of which notice will be given by my executors to their guardian. *Item.* I direct that my three farms of *Greenock Park, Greenock Farm,* and part of *Obligation,* lying in *Anne Arundel* county, together with the negroes, stock, tobacco and farm utensils, not otherways devised, be sold, and the money applied to the purchase of bank stock, which together with my stock of the *Bank of Maryland, Bank of Baltimore, Bank of Columbia, Bank of Washington,* and the *Farmers Bank of Maryland,* I bequeath to the two sons of my brother ——, they paying to each of their sisters the sum of five thousand dollars. I hereby appoint my two brothers, *William* and *James,* and my nephew *Frisby Tilghman,* executors of this my last will and testament. In testimony whereof I have hereunto set my hand, and affixed my seal this —— day of ——, one thousand eight hundred and ——.

(Seal.)

Signed, sealed, published and declared, by the testator, as and for his last will and testament, in the presence of us, who at his request and in his presence have subscribed our names as witnesses thereto.

Test,

X X
X X
X"

On the envelope is thus written to wit: "presence have subscribed our names as witnesses thereto.

Test"

Afterwards, on the 25th of October 1814, this paper was exhibited to the orphans court by *James Steuart,* one of the executors named in the said paper, *George H. Steuart,* son of the said *James,* and *Richard S. Steuart, Margaret Steuart, Sophia Steuart, Henrietta Steuart,* and *Elizabeth Steuart,* also children of the said *James,* appearing by him their guardian, claiming to be legatees and persons beneficially interested in the establishment of the said will, and required that the said will be admitted to probate, and that letters testamentary be thereupon granted to *William Steuart, James Steuart,* and *Frisby Tilghman,* the executors therein named: The court ordered that letters of collection be granted to *William Steuart, James Steuart* and *Frisby Tilghman,* to preserve the personal estate of the deceased, and continued the case under advisement. At the next term *Frisby Tilghman, Susan Holliday, William Steuart, George C. Steuart, Benedict Steuart, Charles Steuart,* and *Edward H. Steuart,* appeared and filed a caveat against the said paper being admitted to probate as the

will of the said *David Steuart*, alleging that it is not his will, but that he died intestate, and praying that the court would not proceed to take the probate of the said paper as the will of the said *David Steuart*, and that letters of administration on his estate might be granted to the parties entitled, and that the parties interested might be summoned. A summons accordingly issued, and the parties were returned summoned, &c. And afterwards *James Steuart*, and others, the respondents, filed their answer to the caveat, alleging that *David Steuart* did not die intestate, as stated in the caveat, but that in his life-time he did make and execute his last will and testament in writing, as appears by the will and testament exhibited, the same being altogether in his own hand-writing, containing a full and entire disposition of his property, and being the only paper purporting to be his last will and testament found at or ince the time of his death, and that he died without having revoked, or any wise altered the said will and testament; therein bequeathing, (among other bequests,) to the respondent *James Steuart*, his brother, a considerable legacy, and to the other respondents, children of the said *James*, by words sufficiently descriptive, and designating them as legatees, other considerable legacies contained in that clause of the will which reads as follows: "*Item.* I direct that my three farms of *Greenock Park*, *Greenock Farm*, and part of *Obligation*, lying in *Anne Arundel* county, together with the negroes," &c. "be sold, and the money applied to the purchase of bank stock, which, together with," &c. "I bequeath to the two sons of my brother ——, they paying to each of their sisters the sum of five thousand dollars." The answer then stated the appointment of executors, the manner in which the will was found, and the names of the several brothers, &c. of the deceased, at the time of his death. That the respondent *James* was the only brother of the deceased who had at the time of his death, and for many years previous thereto, both *sons* and *daughters*, as described and designated in the foregoing clause of his will before quoted and recited. That the will and testament exhibited is a good and sufficient testamentary paper, and was intended as such by the deceased. They therefore prayed that they might be permitted to take the testimony of witnesses for the purpose of establishing the foregoing facts, and in order to prove every other matter and thing necessary for the admission of the said will and testament to probate; and that the court would proceed to admit the said will and testament to probate as before prayed, and that letters testamentary thereon might be granted according to the directions of the will. The testimony of witnesses, and the admission of the parties, proved the manner in which the will was found, and the names of the several brothers, &c. of the deceased, as herein before stated. The paper exhibited as the will of the deceased, was proved to be entirely in the handwriting of the deceas-

ed. Col. *John F. Mercer*, in a part of his testimony, stated that he "recollects that some years ago, when in the habit of associating frequently with the late *David Steuart,* he has had conversation with the deceased, in which Mr. *Steuart* remarked to him that he was astonished how any man of common prudence or sense could die intestate; that from the time he had had any thing to dispose of, he had made it a point always to have a will by him, or words to that substance, or to that effect." This part of the testimony of Col. *Mercer* was objected to by the caveators, as inadmissible. It was also proved that *Ann Steuart,* the mother of the deceased, died on the 18th of August 1814, and that the deceased died on the 11th of October 1814. *James M'Culloch,* in his testimony, stated, "that he has long known the late *David Steuart,* and lived with him in habits of intimacy to the time of his death. That he had frequent conversations with him respecting wills and the testamentary dispositions of property. That he always and uniformly reprobated the neglect of persons to make their wills. That the deponent had a conversation with him shortly before his death, and after the death of *Ann Steuart,* his mother, which happened six weeks, or thereabouts, before his death. This conversation had no immediate relation to the testamentary dispositions of said *David Steuart;* but he then alluded to the liability of his being cut off, and spoke generally of the propriety and duty of every man being prepared with a will. That whenever the deponent had conversation with the said *David Steuart* on the subject of wills and testamentary dispositions, he always declared that he was prepared with a will, and kept a will by him, or words of that substance and to that effect." A letter was offered in evidence, written by *Frisby Tilghman* to *David Steuart,* dated the 14th of May 1814, and it was admitted, that the writer of that letter had purchased for *David Steuart* 250 shares of stock in the *Conococheague Bank;* that the said purchase was made a few days before the date of the letter, and stood in the name of the said *Tilghman,* and that this letter was the letter advising of the said purchase, which letter was found among the papers of *David Steuart* It was also admitted that *David Steuart* had always been, until his death, a man of intelligence and information, and well acquainted with the manner and form of making wills; and that he was also well acquainted with the names of his brothers and sisters, and his nephews and nieces, and all his family connexions. That *James Steuart* was the only brother of the deceased who had both sons and daughters alive at the death of the deceased, and for many years before. That the words, as written on the envelope or paper inclosing the paper purporting to be the will of *David Steuart,* were written on the top of the inside page of said envelope, (being a half sheet of letter paper,) and that the said words nearly correspond with the concluding words of the paper purporting to be the will of *David Steuart,* written on the third page

1816.

Tilghman
vs
Steuart

of an entire sheet of letter paper on which that will is written.  That the paper purporting to be the will of *David Steuart* is altogether in the hand-writing of the said *Steuart*, as are also the words written on the inside of the envelope.  That *David Steuart* generally enjoyed good health until his death, which was sudden.  The Orphans Court, [*Mackubin*, Ch. J. *Ridout* and *Maynadier*, J.] decreed, that the caveat of the caveators be dismissed, and that the said paper be admitted to probate as the last will and testament of *D. Steuart* as to his personal estate.  *Decreed* also, that the respondents recover against the caveators their costs, &c.  From this decree the caveators appealed to this court.

The cause was argued at the last term before CHASE, Ch. J. and BUCHANAN, NICHOLSON, JOHNSON, and MARTIN, J.

*Martin, Shaaff* and *Taney*, for the Appellants.  There are two grounds of objection to the paper purporting to be the will of *David Steuart* being admitted to probate—1. It appears from the face of the paper that he did not intend it in that state to be his will; and 2. Such a paper had been adjudged not to have validity as a will to pass personal property.

1- The paper has blanks, and no person is named as legatee.  There is no signature—no date.  It has the formality of a perfect will, and was designed as a will to pass real and personal property, and although found in a place of security, it is obviously an incomplete instrument—merely the draft of a will.  He did not intend it as his will, or why omit to insert the names of the legatees?  It is admitted he knew the names of all his relations, and that he understood the manner of devising real estate.  The form of the attestation to the paper, with the three stars, shows that it was intended to have three witnesses,  It is conclusive he did not mean to leave the paper as it stood for his will, for he well knew it would not pass his real estate; and it cannot be supposed that he intended that his real estate should descend differently from what the paper purports it should.  It must be a will at the time he wrote it, and no circumstance or after act can give it validity unless he expressly declared it to be his will.  This he did not do.  Something more, it is evident, was intended to complete it as a will to pass the real estate, which professed to be the intention of the deceased.  Some of the blanks may be easily filled from the descriptions given, but the two first cannot be.  He had two brothers living at the time of his death, and it is uncertain which brother was meant in either of the two first blanks.  Part of the deceased's property was not disposed of; for in May 1814, stock was purchased for him in the *Conococheague Bank*, and it was not mentioned in the paper, nor is there any general residuary clause by which that stock will pass.  If he had finally con-

cluded and meant it as his will, why leave blanks? It is evident he was in doubt, as he well knew the names of all his connexions, and was a man of intelligence. It was a paper which he held under advisement. The envelope shows he had before probably a paper for his will which he had changed. Why not then change the one now produced? It shows he had, upon second thought, abandoned a former draft, and prepared another for consideration.

2. To show that wills like the present have been judged insufficient to pass personal property, they cited and relied on *Mathews vs. Warner*, 4 *Ves.* 186, 197. (*Griffith vs. Griffith, in notes.*) *Mathews vs. Warner*, 5 *Ves* 23. *Coles vs. Trecothick*, 9 *Ves.* 249. 7 *Bac. Ab.* tit. *Wills & Testaments*, (D 2) 328. 3 *Swinb.* 969, 971. *Rob. on Frauds*, 453; and *Alexander Stewart's* will decided on by this court on the *Eastern Shore*. That case appears to have been this—That after the death of *A. Stewart*, three papers were produced as his will. In the first the names of the devisees in the latter part of the paper were left blank, and supposed to have been written between 1798 and 1800, and not signed, but in the hand-writing of the deceased. The second was written after the spring of 1809, in which there was no bequest inconsistent with the first: and was written in the hand-writing of the deceased, and *A. S.* signed to it. The third was made when the deceased was not capable of making a will. There was proof that the deceased had said five years before, and two months before his death, that he always had a will by him. He informed one witness he had a will by him, but that it was not complete, and he informed another witness, two months before his death, the same thing. The second paper was found in a trunk not locked, with shares of bank stock, in a closet locked, and the key kept by the deceased. The orphans court admitted the will to probate, and on appeal to this court the decree of the orphans court was reversed. As to the respect which is to be paid to the conversations of the testator, they cited *Pemberton vs. Pemberton*, 13 *Ves.* 301.

*Pinkney, Harper* and *Stewart*, for the Appellees. 1. The paper insisted on as a valid will to pass the personal property, is wholly in the hand-writing of the deceased, with his name written at the top, and a formal seal affixed. 2. There is no other paper produced purporting to be his will. 3. The paper produced is full and conclusive in point of form as a will. 4. There is a good appointment of executors. 5. It substantially disposes of the whole property of the deceased. 6. It was found under circumstances of great security. 7. It is not condemned by any evidence in the record.

Although there are many blanks in it, yet it sufficiently designates the legatees, by which it can be known who are meant. The deceased had only two brothers at the time

of his death, and for many years before. The first blank meant *William.* The second meant *James.* The third meant *Frisby Tilghman,* who was the only nephew of the deceased, who had children. The fourth is ambiguous, but it can be ascertained. The fifth, the sons of his brother *Charles* were meant. The sixth meant the grand-children of his brother *George,* being the only brother who had grand-children. The seventh meant the two sons of his brother *James,* being the only nephews who had sisters. No other brother had sons and daughters. This bequest is clearly made out; and it is contended that it sufficiently designates who are meant as legatees, and if so it is as valid as if their names were inserted. Nothing remains but to see what the testator meant. We must attend to the will itself, and all the circumstances with which it is accompanied. They must be taken all together. It cannot be argued from authorities; we must look for principles. The intention of the testator is only to be regarded. This paper is what the law calls an olograph will, every word of which is in the hand-writing of the testator. It is not like a paper written by another person. This is the first distinguishing feature. The second is his name in the introduction, also written by himself. It is considered as complying with the statute of frauds. Again, the will has been *sealed* by the testator—a formal seal affixed; not a seal made by a pen, but one carefully annexed, and it has been held by Lord *Raymond* and Lord *Holt* that sealing was equal to a signature under the statute of frauds. But this will is not under the statute, so that it is still stronger. There are three great essential qualities to make this a valid will. 1. The seal accompanied with the name, which never could be doubted under the statute of frauds. 2. It contains a good and explicit appointment of executors. 3. It contains a valid disposition of the testator's property. There is no ambiguity in the property devised. But there are blanks for the names of the legatees; yet it will not be denied that if the will was executed, according to the statute, with the blanks left, it would not be rejected because of the blanks. It is admitted that description may stand in the place of a name. If there is a mistake in the name, and the description sufficiently designates who is meant, it will control the name. *Pow. on Dev.* 405. *Abbot vs. Massie,* 3 *Ves.* 148. It has been admitted that the blanks would be of no consequence if the will had been formally executed. Is there any doubt as to the bequests under which the appellee's claim? The blank is as to the name of the brother, not as to the legatees. Nor can there be any doubt as to the other blanks. It is not contended that it is to be taken absolutely as a will of personal property; but *prima facie* to be considered as a testament. That doubts may be raised as to who are meant in the blanks. So it would be the case if it was formally executed. It would not then be permitted to be said that it was not a will. If imperfect upon the face of it, evidence could

not supply the imperfection. But if simply doubtful, then parol evidence might be admitted to solve the doubt. What is wanting to make this *prima facie* the will of *David Steuart?* Did it want a name? Did it want a seal? Did it want a signature?' A will of personal property requires neither name nor signature. It was wholly *written* by the testator. Was it deficient in the appointment of executors? Did it require publication? None was necessary—no acknowledgment was required. The attesting clause was only required as to the real estate. There is nothing in it which does not make it a valid will as to the personal estate. It may be a will if wholly in blank—the blanks do not vitiate it as a will, if it comes clothed with the forms which the law requires. There can be no inconvenience in admitting such a will to probate. None but those who are shown to have been meant by the descriptions given, can take under the will. It was put in a place of security—the trunk locked, and the key kept by himself. In the trunk were his most valuable papers, and the will placed at the bottom under certificates of bank stock constituting the great mass of his wealth. That the trunk would be examined for his will there could be no doubt. His placing it under the certificates of stock at the bottom of the trunk, shows it was not intended simply as a plan or draft of a will; for if he had so considered it, would he not have put it where instant recourse might be had to it in order to perfect its execution on a sudden indisposition? Having completed it as a will so far as it went, he might have intended to do something further; but as he knew it was not formally executed, it would be a good will as to his personal property only. He knew three witnesses and a publication were necessary to pass the real estate; and he also knew that witnesses and publication were not required as to the personal estate. There can be no doubt then that it is *prima facie* the will of *David Steuart,* and it is incumbent on the appellees to show that it is not *prima facie* his will. It is under the authority of 3 *Swinb.* 971, entitled to be considered as a will, and not a plan for one. Here are no visible imperfections —no interlineations—no breaking off abruptly. The *animus testandi* was existing at the time it was written, and it was deposited in a place of safety. But it has been said that new property was acquired. How new property? One fund converted into another. This did not make it necessary that it should be included in his will. He left this to satisfy the general pecuniary legacies, and to pay his executors their commission. Every thing was done to make it a will of the personal property, and no doubt he did intend to make it operate as a will of his real property also. The court are to attribute the attesting clause to that circumstance. *Matthews vs. Warner,* 4 *Ves.* 200, *(note.)* 1. It does not appear to be a mere plan, but to be a disposition of his property. 2. The evidence fully supplies all doubt. 3. If it is not regarded as a final but only a

formal act intended, it is not material and does not invalidate it  The will purports to be a complete disposition, and the evidence is sufficient to make it complete.  What are the decisions before the revolution; and how far do those since vary the doctrine?  And if they do vary the doctrine how far are they entitled to be regarded?  The law, as it existed before the revolution, is the law which now exists in this state.  What then is the doctrine of the old cases?  *Swinb*. 969, 971.  *Limbery vs. Mason*, 2 *Com. Rep.* 451, 452, 454.  *Butler & Baker's* case, 3 *Coke*, 31, b.  *Dep. Com. Guide*, 78.  *The Visitors, &c. vs. Bruce*, 1 *Harr. & M'Hen.* 509.  But the authorities referred to by the appellants' counsel, when analyzed, do not impugn the doctrine contended for on the part of the appellees.  All the cases go to show that the absence of the signature is of no consequence.  *Manby vs. Scott*, 1 *Siderf.* 128.  *Stephens vs. Gerrard, Ibid* 315.  1 *Swinb.* 80, *(note)*; and *Rob. on Wills*, 198.

*Curia adv. vult.*

At this term the judges delivered their opinions *seriatim.*

MARTIN, J. This case is important not only from the amount of property involved in it, but from the principle that will be established by its decision, and unanimity in the opinion of the court would have been a source of great confidence and satisfaction to me.  As that, however, unfortunately has not prevailed, I will concisely state some of the reasons upon which I have formed my judgment.  This case originated from an application to the orphans court of *Anne Arundel* county, to receive for probate an instrument of writing purporting to be the last will and testament of *David Steuart*, deceased; a caveat was entered by some of the representatives of the deceased to this application, and the orphans court, after receiving the testimony produced by the parties, dismissed the caveat, and admitted the paper to probate, so far as it related to the personal estate.

In an investigation of this kind, the instrument of writing purporting to be a will, is the first object that claims our attention.  This instrument professes to dispose of both real and personal estate.  It contains seven devises and legacies, leaving a blank in every instance for the name of the devisee or legatee.  It has the form of attestation and a seal, but no date, signature or witnesses; and the question for the decision of the court is, whether *David Steuart* intended this paper, in its present imperfect and unfinished state, to operate as his will?

The requisites to constitute a will of real estate are clearly and fully established, and it is much to be regretted that the rules relative to a will of personal property are not equally explicit.

A will to convey lands must be perfect on the face of it, and no defect can be aided or supplied by parol evidence.

It must not only be intended by the testator as his last will and testament, but must be executed with all the solemnities required by law. The same strictness is not demanded for a will of personal property; but. to constitute a good will even for *that* purpose, the paper must either be complete on the face of it, or must be supported by parol evidence. It must appear from circumstances, or the declarations of the deceased, that it was intended to operate as his will in its imperfect and unfinished state. If it be complete on the face of it, it requires no adventitious aid, it is full evidence in itself of the intention of the testator. But if incomplete and unfinished, and other acts are evidently required and intended to be done to give it full authenticity and completion, in my opinion, it cannot be received as a will even of personal property, unless evidence is produced to satisfy the court it was intended to operate as such, in its imperfect and unfinished state. This I conceive is not, as was suggested by the counsel, a novel doctrine, but has been recognized and acknowledged, from the time of *Swinburne* to the present day.

It must be admitted that this paper *in itself* is extremely incomplete as a will—indeed without the aid of parol evidence, it is incomprehensible. Besides the absence of date, witnesses and signature, it makes a disposition of real and personal property, but does not name any person to receive it—conscious of these defects, the testimony of witnesses has been resorted to, to show *David Steuart* intended it as his will in its present state. This testimony then demands our attention. It appears from the record that *David Steuart* possessed a considerable real and personal estate, that he was a man of information, and knew what was necessary to constitute a good will to transmit his property.

Although the particular time when this paper was written does not appear, yet it is evident it must have been before the death of his mother, at least six weeks prior to his own death, and that during that period he was in good health until a very short time before his dissolution. These circumstances I consider all important in the case, because from them the incompletion of the will cannot be attributed to ignorance or sudden calamity.

As this paper contains dispositions of real as well as personal property, it is fair to conclude, *David Steuart* inteaded it should operate equally upon the one as the other, and not that it should be a good will as to the personal, and not the real estate. It is clear that he could not intend it to operate as to his real estate, in its present unfinished form, because from the paper itself it appears that he knew other acts must be done before it could be operative for that purpose—the form of attestation—the three little marks for the witnesses, and the seal, leave no doubt in my mind upon this subject. Is it not equally clear that he intended, before this paper should be his will, other acts should be done to perfect the bequests of personal pro-

1816.

Tilghman
vs
Steuart

perty? How otherwise can you account for the blanks in every instance for the names of the legatees? It is stated that the intended legatees were all his immediate connexions; of course he could be at no loss for their names. If then he had determined this paper should be the ultimate disposition of his property; if there was no *suspended* intention relative to it, why did he not insert those names? The blanks, in my opinion, afford strong evidence that he did not intend this paper, in its present form, to be his will. That he kept it by him as preparatory to a will. An inchoate paper that he could complete at any time, if he should ultimately determine to dispose of his property as therein mentioned. It cannot be denied that the description of a legatee would have the same effect in law as naming him, if the testator *intended* to substitute the description for the name. But the blanks in this case clearly show that *David Steuart* had no such intention; that he did not mean to rely on the description of the legatees, but before the will was completed to fill up the blanks with their names.

But it has been contended that this paper was verbally acknowledged by *David Steuart* as his will, and his conversations with Col. *Mercer* and Mr. *M'Culloch*, have been relied on to prove this position. Col. *Mercer* deposes "that *some years agone*, when in the habit of associating frequently with the late *David Steuart*, he has had conversations with the deceased, in which he remarked to him, "that he was astonished how any man of common prudence or sense could die intestate; that from the time he had any thing to dispose of, he had made it a point always to have a will by him, or words of that substance, or to that effect." Mr. *M'Culloch* states "that he had frequent conversations with the late *David Steuart* respecting wills and the testamentary dispositions of property; that *Steuart* always and uniformly reprobated the neglect of persons to make their wills; that shortly before the death of the said *Steuart*, he alluded to the liability of his being cut off, and spoke generally of the propriety and duty of every man being *prepared* with a will; that he always declared he was *prepared* with a will, and kept a will by him, or words to that effect."

The question arising from this testimony is, whether in those conversations, *David Steuart* intended to apply his declarations specifically to this paper, because if that was not *his intention*, however prudent they may have been in theory they can have no operation in this cause. It may be observed that the evidence of Col. *Mercer* may be inimical to the will. If the declarations of *David Steuart* to him did not allude to this paper, they can have no effect upon it—If they did allude to it, as the conversations took place *some time since*, it clearly proves that it had been in the possession of *David Steuart* for the period, not merely of six weeks, but of several years, and remaining so long in his possession unfinished, and evidently on the face of it proving that he intended further acts to be done to give it full

authenticity, it would create a fair presumption in law, that he had abandoned and did not intend to complete it.

But can it be believed that those general declarations of *David Steuart* were intended by him to apply to this paper? The will he had in contemplation, as being such as every man ought to keep by him, was one that would .effect the object for which it was intended—would dispose of all the property mentioned in it, and preserve harmony among his representatives. He knew a will to effect that purpose must be executed according to the solemnities of law, and that an unfinished paper, without attestation or signature, could not convey his real estate. If Mr. *Steuart* was under the impression that it was the duty of every man to be *prepared* with a will, can it be presumed he considered himself placed in that situation, by this imperfect paper, which he well knew would not transfer his real property? If, according to his declarations, it was wise and prudent to keep by him such a will as would make a full disposition of his property after his death, it would be the excess of folly, to rely upon a paper of this kind for that purpose, which at all events, leaves the real estate undisposed of, although named in it, and would inevitably involve his representatives in litigation and dispute. The character given of Mr. *Steuart* in this record, forbids such an imputation. He could not therefore intend to apply them to this paper.

It is my opinion, that this paper being incomplete and unfinished on the face of it, evidently requiring other acts to be done to give it full authenticity, and no testimony being adduced sufficient to satisfy my mind that *David Steuart* intended it should be his will in its present form, that it cannot be received as a will even of the personal property—that the decision of the orphans court is erroneous and ought to be reversed.

JOHNSON, J. The case before the court arises on an appeal from the decision of the orphans court of *Anne-Arundel* county, under which, a paper, purporting to be the last will and testament of *David Steuart*, has been received, and recorded.

The paper in question is written entirely in the handwriting of the deceased, who is admitted to have been an intelligent man, well acquainted with the manner in which wills of real and personal property are to be executed, and who, from the evidence in the cause, lived in good health for several weeks after the existence of the writing in question. There are blanks in every disposition he made of his property, or intended to have made, by the instrument of writing in question. In some instances, the facts stated in the record before the court, reduce to a certainty the object of the testator's bounty; in other instances it is difficult, if not impracticable, consistent with established legal principles, to designate the legatee; there is no date to the will—it was sealed, but not signed by the testator, and on

1816.

Tilghman
vs
Steuart

its face it evidently purports an intention to have been executed, in the presence of subscribing witnesses, in conformity with the provisions of the statute of frauds, so as to have been effectual as well to pass the real, as the personal property described therein; and after the death of the writer, it was found carefully folded up, and lodged in a secure place amongst the deceased's valuable papers.

On the preceding facts, united with the parol declarations of the deceased, and the circumstance that the instrument in question was complete in the designation of the property intended to be given in every instance, except as to the names of the legatees, who in some instances are so described as to remove every particle of doubt, the question arises, Can such an instrument, consistent with the established principles of law, be received as the last will and testament of the deceased?

Against the validity of the will it has been contended, that notwithstanding the ancient decisions may have supported such instruments, the modern determinations establish a different doctrine, and where "the paper in question, on its face, carries evidence of an intention in the framer to perfect it by some further solemnity, which he has died without having superadded, having had afterwards sufficient time and health and recollection to complete it, such paper may be inferred not to have been intended to operate as it stood, and the omission to perfect it may ground a presumption of a change of mind in the deceased." *Roberts on Frauds*, 453.

If the position thus advanced was to be received in its full extent, the consequence would follow, that no will, designed to pass real and personal property, where an intention on its face was manifest that it was designed to have been executed in conformity with the statute, could be effectual to pass the personal property, although signed and sealed by the testator; for as it would be apparent on the face of the paper witnesses were designed to be obtained, the not procuring them would justify, according to the position, the inference of a change of mind on the part of the deceased. To this extent the principle has not been urged in this cause.

But it is contended, that the circumstance of the intended legatees' names having been omitted, united with other facts disclosed in the case, and the time that elapsed after the paper was written, if they do not evince a change of mind, establish a more important point, that the testator never had made up his mind as to whom he would give his property; and that the paper in question never was designed as his will, but was only intended as an instrument, by which, at any moment, he might be able to carry into full effect a more matured mind. In other words, that the instrument in question was not written *animo testandi*.

The objection thus made is extremely plausible; and if nothing else existed in the cause than the paper in question, and the evidence that full time existed for its full

1816.

Tilghman
vs
Steuart

completion, I should be inclined to think, notwithstanding the careful manner it was placed away, and the other circumstances connected with it, exclusive of Mr. *Steuart's* declarations, that it ought not to be received as a will.

In turning my attention to this case, and examining the principles on which the validity of wills depend, and the obligations they impose on those claiming under them, I have been led to believe cases of this description demand legislative interposition; that persons ought not to be permitted to claim the personal property without a proportionate release of their interest in the real. The only instance in which, connected with a will, that a court of equity cannot give relief, is a *defectively* executed will—and cases of that description frequently call for the interposition of the principle *qui sentent commodum debent sentire et onus*, as those instances to which that principle applies.

Although it seems, nay I may add, is but just, amongst those, who in case of intestacy would inherit the property, that no claim under a will purporting to dispose of the real and personal property should be sustained, yet nothing is more certain, than that the law is otherwise; and as we find it, so are we bound to declare it, and not by establishing a different rule enact a new law. But instances of this kind could never occur in court, or scarcely ever exist in fact, if the will purporting to convey both, could not pass the personal alone; for, perhaps since the statute of frauds, no such will has been written without *disclosing* on its *face* an intention to obtain the requisite formalities.

In forming an opinion in this case, there appears no necessity to introduce adjudications, that *blanks* left for the *name* of the *legatee* will not *defeat* the legacy, provided he is *otherwise sufficiently described;* nor is there any occasion to establish by authorities, that *intended dispositions, being void for uncertainty*, will not *defeat those* where that *uncertainty* doth not exist. The opposition to the paper in question rests on different grounds, to wit—He had never made up his mind to give to any person; that the paper in question was not written with an intention to give, but as a draft to enable him to give when his mind was fully made up.

As a will can be valid so far as regards personal property, although it purports a disposition of real, without that passing, even when, on the face of the will, an evident intention is disclosed to execute it with other formalities, it follows, the testator, to pass the personal, need not possess, at the same time, an intention to part with the real; or if such intention exists, and that is defeated for the want of the requisite formalities, the personal dispositions are not defeated.

Having thus premised that a will may be valid as to the *personal*, when void as to the *real;* that they are not *necessarily* void in consequence of *containing blanks;* that *bequests void in themselves for uncertainty* will not affect those to which no such objection exists; and that the *evinc-*

1816.

Tilghman
vs
Steuart

*ing, on the face of the will,* an intention to have *it execut-ed* in the *presence of witnesses,* will not *defeat* the *personal bequests,* I will add only one other observation before I proceed to consider the paper in question, purporting to be a will, now before the court.

If an intention disclosed on the face of the will to do some other act in *regard to the personal bequests* was to defeat such bequests, on the ground stated of a change of mind in the deceased, or on the foundation that the mind was never made up, then it would appear to me to follow, that no will designed to pass personal pro-perty could be effectual where a blank existed; for I must conclude no one can or ever did believe, but that at *the time* the blanks are left, an intention existed to fill them up at some future period. But although all must believe the de-ceased did intend at the *moment* he *left the blank, at some other time to fill it up,* omitting to do so *will not defeat the will,* if the object of his bounty is otherwise ~~ficiently~~ described.

The paper in question was found, as has been before stat-ed, all in the hand-writing of the deceased, an intelligent man, well conversant with the manner of ~~such wills~~, carefully folded up in a paper, evidently disclosing on its face also to have been the termination of a former instru-ment, purporting to have been a will, and deposited in a secure place—Yet, as there are such imperfections in the paper in question, if its validity rested here, I should say it ought to be rejected.

Had the paper in question, with all its imperfections on its face, been executed according to the statute of frauds, it seems to have been conceded, (as most undeniably would have been the case) it must have been established; for then the *animus testandi,* as conceded on all sides, would have been disclosed; and yet the objects of his bounty would then have been as uncertain as at present; the formalities of the execution could not have made it more plain, or have removed any of the doubts that now exist, as to those who are to take.

But if the *formal execution* of the will, imperfect as it is, would have established it, then any other act done, or any evidence obtained acknowledging it, in addition to the cir-cumstances connected with the paper in question, must produce the same result; for if the *formal* execution could have established it, then the instrument itself, in conse-quence of any, or all the blanks, in consequence of any or all the imperfections and uncertainties disclosed on its face, do not of themselves so completely establish the want of the *animus testandi* as to render it void, for if they did, proof of its due execution could not establish it as a will—And, as a will in the hand-writing of the testator is suffi-cient to pass personal property, and there being proof com-plete that the paper in question is of that description, it would appear to follow, that subscribing witnesses could give it no additional validity. But if it required any, such

proof exists in the case; for it is proved by respectable witnesses that the testator to one declared "he made it a point always to have a will by him," and to another, and that after the will in question was written, "that he was prepared with a will and kept a will by him," thereby evidently recognizing the paper, as fully and effectually as if he had produced it to the witness, and acknowledged it as such before him; unless the evidence discloses, or at least raises a doubt, whether he meant by his conversation with the last witness a paper different from the present. The declaration made to the first witness was some years previous to Mr. *Steuart's* decease; but it is more than likely, from the want of evidence that subscribing witnesses were ever called for by the deceased, united with the envelope having been executed similar to the will in question, that he never had executed a testament in conformity with the statute; and therefore, when he spoke of a will, he meant one calculated to pass personal property. From the evidence existing in this case, my judgment is satisfied, that the evidence by the first witness applies to *such* wills, and that the evidence of the other witness relates to the *one* in question, thereby recognizing it, with all its imperfections, as his last will and testament, and that the decision by the orphans court, directing it to be recorded, was correct.

Nicholson, J. Until I came into court this morning, I did not know that it was the intention to deliver opinions in this case *seriatim*, and I had not therefore reduced my opinion to writing. Finding, however, that all my brethren are prepared with written opinions, I will state briefly, that the objections to the paper in question are not that the blanks render it invalid as a will for the uncertainty, but that they manifest an indecision on the part of the testator—they show that at the time of writing, the *voluntas testandi* was not complete. No attempt has been made to assign a reason for leaving the blanks, and as it is admitted that *David Steuart* was acquainted with the names of the alleged objects of his bounty, it would seem necessarily to follow that if he had decided finally, the names would have been inserted where the blanks are now left.

It is true, that if the paper had been executed agreeably to the statute of frauds, the blanks would not have defeated it as a will, although they might have rendered some of the devises inoperative for uncertainty—But it could nevertheless have been a will. The signing, sealing and attestation, would have evidenced the *voluntas testandi*, whimsical as that *voluntas* must appear, which has the complete power of expressing itself, yet leaves itself to be guessed at for years perhaps afterwards. But we are not called on to construe it now. It is our province to say whether it is such a paper as shows a fixed and settled determination of the deceased to make a final disposition of his property. The declarations of *David Steuart* do not aid it. It is impossible that he could have alluded to this

paper when he said he had a will, &c. for it is admitted that he knew it would not pass his real estate, and knowing this, he could not, consistently with a regard to truth, refer to that which would not prevent the evils which he professed to be desirous of guarding against.

A will of real estate is placed by the statute of frauds on a very different footing from a will of personal estate. In fact they hardly belong to the same class of instruments. A will of real estate is a statutory conveyance; and in order to determine whether it be a will, we are to look only to the *formality* of *execution*. If the *forms* required by the statute have been complied with, we are precluded from saying it was not written *animo testandi* without regarding the nature of its provisions. But in a will of personal estate, having none of those formalities, we must look into the body of the instrument for *substance* more than for *form*. We must search for the *animus testandi*, and that must be collected from a view of the whole subject matter without regard to technical rules; for on such a subject there can be no rule applicable to all cases. In this case all the devises are to persons for whose names blanks are left; and one half of them are not even so described as to enable them to take under a will executed with all the solemnities required by the statute. It does not therefore bespeak to my mind such a fixed and settled determination on the part of the deceased as is all important to constitute a last will and testament, and I concur in the opinion that *David Steuart* died intestate.

BUCHANAN, J. This is an appeal from a decree of the orphans court of *Anne-Arundel* county, on a caveat by the appellants against a paper, purporting to be the last will and testament of *David Steuart*, deceased, being admitted to probate.

By the decision of that court the caveat was dismissed, and the paper admitted to probate, as the last will and testament of *David Steuart* as to his personal estate. And the question presented to this court is, Whether that paper is the will of *David Steuart?* In the discussion of this cause, most of the adjudged cases, having any analogy to it, have been cited; but it is difficult to decide such questions upon the authority of adjudged cases, for it is in vain to look for cases exactly parallel; they are not to be found—each case depending upon its own particular circumstances. We must, therefore, look, not to the decisions made on the facts arising in reported cases, but for the *principles* governing those decisions. And it seems to have been long well settled, that to constitute a written paper a "last will and testament," it must appear that the deceased possessed *animum testandi* at the time it was written; and that he intended the paper as it stood to be his will, without looking to any thing further to be done in order to perfect it.

174

1816.

Tilghman
vs
Steuart

And it is laid down, that if a man leaves an instrument purporting to be a will, which is unfinished, or carries evidence on the face of it of an intention in the framer to have perfected it by some further act, which he has died without doing, having had sufficient time and health to complete it, it shall not be received as his will, but he shall be presumed to have changed his mind.

The first thing to be considered then in this case is, What was the intention of *David Steuart* at the time he wrote the paper before us? And to come at a correct solution of that question, recourse must be had to an examination of the paper itself, which upon the face of it appears to be very imperfect.

No person is named as a legatee or devisee, but every devise is in blank as to the person, some of which cannot be filled up. The two first are of this description; each is a devise to his *brother generally*, without being named, with a blank left for the name; he had two brothers then living, and it is altogether uncertain which of them was meant in either of those devises. It is not signed, and is without date, blanks being left for the month and day of the month, and it is broken off at the end of the words, "one thousand eight hundred and," leaving the particular year of the century to be added. These, perhaps, are not alone circumstances to set aside a paper, if the testator intended it to be his will in that form, without any thing further being done; but they are circumstances to weigh on the mind of a judge in looking for the intention of the party. It is said that a person may take as a legatee or devisee under a will, by description, without being named. But in every such case it would seem that the description must be such as the testator intended to rely upon, without any thing being superadded. In this case, something further seems to have been intended, and the blanks left, afford evidence of that intention. They show that *David Steuart* did not, at the time, intend to rely upon what was *written*, as a description of the persons to take under his will, but left the blanks to be filled up at another time with their respective names, or with some further and more perfect description; Or why were those blanks left? Certainly not of themselves to perform any useful office, since they, as blanks, give no description, nor afford any evidence of who were *intended* by the deceased. If he had been ignorant of his family, that circumstance might, in some sort, be used to account for his not describing by name those who were intended as the objects of his bounty. But it appears that he was well acquainted with every branch of his family—Why then, if his mind was made up, if he had finally concluded on the manner of disposing of his estate, did he leave blanks so important as those relating to the names of the legatees or devisees, and particularly when some of those blanks cannot be filled up with any degree of certainty by those best acquainted with every member of his family? The same may be said of the blanks in relation to the date—for though a will may be

good without date, yet in this case, a date is in part set out, and blanks left for the residue; from which it is plain, that if he meant ever to perfect the paper produced, as his last will and testament, he intended to date it at the time it should be so perfected, and left the blanks for that purpose. The absence of the signature of the deceased, at the bottom of the paper, if it were perfect in other respects, would of itself be of no importance, seeing that it is written by himself, with his name set out in the beginning, and a seal annexed. But it is of importance, taken in connexion with the other imperfections apparent on the face of it; the particularity of which imperfections show them not to be mere omissions, or the effect of accident or ignorance, but the result of a deliberate intention, not to complete it at that time, with a view either of filling them up at some other time, when he should perfect that particular instrument as his will, or of keeping the paper itself only as a project of a will, or a draft either for consideration, or as a direction whereby he might readily make his will. There are other circumstances apparent on the face of the paper produced worthy of consideration, which have a strong tendency to show that it was not written *animo testandi* as it then stood, without any thing further being done. The clause of attestation is very formally drawn, to which is superadded the word "Test," and immediately following, three small crosses. Now this was certainly done for some purpose, and as the object could not have been to give effect and efficacy to the paper as it then stood, it would seem as if they were used as memoranda for the government of the deceased, the word "Test" denoting, that when finally executed, it must be subscribed by witnesses, and the crosses directing the number of the witnesses, and the places where their names should be written. The frequent declarations ascribed to the deceased, that he was prepared with a will, and had one by him, cannot be applied to this paper, if he is to be understood as meaning that he had a finished and regularly executed will, but must have related to some other paper; for it is in proof that he was a man of intelligence and information, and well acquainted with the manner and form of making wills, and could not therefore have alluded to this unfinished and imperfect paper, which purports to be a will of both real and personal estate, but which he knew was not such an instrument as would pass real property. And there is nothing in the whole of the evidence to identify this paper as the one spoken of by him. But if he did allude to this paper, he could only have meant that he had a paper which he could at any time perfect as his will. or by which he could make one, and not that it was his will in the form it then bore; and that he generally kept a draft or project of a will by him, which he destroyed according to circumstances, may well be inferred, from the fact, that on the envelope were the concluding words of a clause of attestation in his handwriting, corresponding with the concluding words of the

clause of attestation, by the paper in question, with the word "Test" also subjoined, evidently the remains of a former draft of a will, to which he may as well be presumed to have alluded, when speaking of having a will by him, as to this paper; and which, together with the paper produced, and the proof that he was in the habit of reprobating the negligence of those who died without wills, very strongly shows that it was not his intention to die intestate as to any part of his property, and that he was solicitous to place his estate by will, in a situation to preclude any controversy amongst his relations. And yet, if he wrote this paper *animo testandi*, and intended it to be his will as it then stood, without doing any thing more to perfect it, he must have known, not only that he would die intestate as to the whole of his real property, which it is evident from the face of the instrument itself, containing devises of his real estate, (which was very considerable,) he did not intend to do, and which no one can believe; but that he would also die intestate as to a large amount in the *Conococheague Bank*, mentioned in the letter of *Frisby Tilghman*, and concerning which no provision is made. And moreover, that the very state of things, which it appears he was solicitous, and which, from the particularity with which he noted the necessity for witnesses, with marks for their number, and the place to be occupied by their names, it is evident he was determined to prevent, would be produced by such an instrument. The paper itself is manifestly an unfinished instrument, intentionally left so by the framer, who died without perfecting it, after having had sufficient time and health to do so; for it appears from the evidence in the cause, that he must have lived in good health, at least six weeks after it was written. It is obvious, therefore, from the whole of the case, that *David Steuart* did not write this paper *animo testandi*; but that he either intended to perfect it by such further solemnities as would render it a valid instrument to pass both his real and personal property, or that it was only written as a draft, or project of a will, for consideration, or to serve him in extremity, and in neither case can the circumstance of his having kept it in a place of security make any difference. And if he did not intend it to be his will as it then stood at the time he wrote it, no man is competent to tell when the *voluntas testandi* did exist in his mind as to that instrument. Applying then to this case the principles before laid down, which appear to run through all the authorities since the time of *Swinburne*, the conclusion seems to be irresistible, that the paper in question is not the will of *David Steuart*.

If I have a doubt on this subject, it is a doubt produced by the much regretted circumstance that two of my brethren, whose opinions are entitled to the first consideration, do not concur with me.

Chase, Ch. J. also delivered his opinion, (which we have not been able to procure,) declaring it to be a good will as

to the personal estate, and that the decree of the orphans court ought to be affirmed.