ELIJAH BOOFTER *vs.* ISAAC ROGERS, ADM'R OF JOSEPH M. ROGERS.—*June* 1850.

In order to make a paper the last will and testament of a deceased person at the time it is written, it must appear that such person possessed the *animum testandi* at that time.

A paper, though not a last will and testament at the time it is written, may be made such afterwards by adoption.

A paper, though intended merely as instructions or a memorandum, to enable the scriviner to prepare the will, will be admitted to probate, if the more formal will be left unfinished by reason of any act which the law pronounces to be the act of God.

There must, however, be a continuance of the intention of the deceased, down to the time when the act of God intervened and prevented the execution of the formal instrument.

An immediate or sudden death is not required, if according to the proof, the jury are satisfied that there was no change of intention in regard to the provisions of the will.

An instruction given to a jury is not necessarily correct, because it is given in the very words which the court of last resort used in a case where they acted both as judge and jury.

An instruction which takes from the jury the inquiry whether the deceased, at the time of preparing the paper, sought to be established as his last will and testament, was of sound and disposing mind and memory, and capable of making a valid contract, is erroneous, where testimony has been offered, going to question his sanity.

If there is proof going to show that a paper, not originally intended as a will, was afterwards made such by adoption, or because without any change of purpose, the party was prevented by death from executing a more formal instrument, it is error to grant a prayer which excludes this question from the consideration of the jury.

APPEAL from *Baltimore* county court.

The appellant filed a petition in the orphans court for *Baltimore* county, on the 29th of April 1848, stating that administration on the estate of *Joseph M. Rogers,* late of said county, deceased, was granted to *Isaac Rogers,* the appellee, on the 5th of October, 1848, but petitioner is informed, and believes that said *Joseph* left a will, by which a legacy is given to him, and he prays that a citation may be issued to said *Isaac,* and that he be required to produce said will if in his possession, and if not, to answer whether he has any knowledge thereof, or of any paper purporting to be a will of said *Joseph.*

The appellee answered this petition on the 10th of May following, and states that said *Joseph M. Rogers* died intestate, never having executed any will. He, however, filed as a part of his answer, a paper marked "JR," which respondent received from *Walton Gray, Esq.,* of *Baltimore,* a short time after the decease of said *Joseph,* he cannot say whether said paper is, or is not in the hand writing of said *Joseph,* it being in some respects similar to, and in other particulars dissimilar from his handwriting; that he did not, at the time of receiving it, nor has he any time since regarded said paper as the will of said *Joseph.*

The following is the paper referred to as JR:

"My sister Mary Ann Magraw, the inst. of five thousand dollars, to be invested in some good stock, such as my father, *Isaac Rogers, Harford county,* shall approve of, who I wish to take charge of it, I, if I should dye before him; if she dyes

without ishue, I wish the money to go back, or revert back to my sister, Martha K. Hartshorn, *wife of Joshua Hartshorn, Harrisburg, Pennsylvania*, and my brother E. S. Rogers, *Harford*, equally, or their heirs.

"My sister M. K. Hartshorn, one thousand dollars.

"My brother Evans S. Rogers, Harf., one thousand dollars.

"Elijah Bufter, *Baltimore city*, five thousand dollars.

"Elijah Bufter's son, Joseph Rogers Bufter, two thousand dollars, the int. to be applied towards his education, untill he arrives at 21 ys., my father to take caharg of it untill this time. The firm of Rogers & Magraw, to be settled imediately. The firm of H. Abbott & Rogers; one year from my death to be settled. My watch and jewelry to my sister Mary Anny Magraw.

"The balance of my property to my father, to dispose of among my sisters and brother as he may deem best. My father to be my *Exetor*."

Afterwards, upon application of the appellant, the following issues were sent to *Baltimore* county court for trial.

1st. Did the said *Joseph M. Rogers* die intestate?

2nd. Did the said *Joseph M. Rogers*, in his life time, make a will, and if so, was such will unrevoked at the time of his death, and what were the contents of such will?

At the trial, the plaintiff proved by *Walton Gray*, that some time in 1847, *Joseph M. Rogers* delivered said paper marked "JR," to witness, with instructions to prepare him a will; with the same dispositions of his property as contained therein, said paper is in the handwriting of the deceased, except the portions in italics, which were interlined by witness, in the presence, and with the assent of deceased; that about two weeks afterwards, deceased, in company with *Mr. Abbott*, his partner, went to witness office to execute the will, when *Gray* said it was not ready, and told him to call again; whereupon *Gray* prepared a will in conformity with the disposition of his property contained in said paper, and called at the counting house of deceased, in *Baltimore*, on two occasions, for the purpose of getting it executed. The deceased was not there on either oc-

casion, and *Gray* never saw deceased at any time, when he had the will so prepared, with him. In about two weeks from the time of last calling at *Gray's* office, deceased called again with *Mr. Abbott,* to execute the will, when *Gray* remarked, "I have prepared the will and left it at my house." About two weeks thereafter, deceased called again, with *Mr. Abbott,* upon *Mr. Gray,* and said, "is the will ready?" when *Gray* said, "I have not been able to find it yet." Deceased then requested *Gray* to prepare a new one. The day before deceased left for *Bedford Springs,* in July, he again called and said, "Is the paper yet ready?" *Gray* said it was not, and inquired of deceased, if he had changed his mind in any way in regard to the disposal of his property? Deceased replied, he had not, he was going to *Bedford Springs,* and it would be time enough when he got back, that said paper remained in the possession of *Gray,* until three or four weeks after deceased's death, when defendant called and demanded it, and *Gray* then delivered the paper to him.

The plaintiff further proved by *Mr. Abbott,* a partner in business with deceased, that in May or June 1847, witness went into the counting house and found deceased sitting at a desk writing. Deceased said to deponent, "I am writing my will, do you wish any arrangement to be made in my will in regard to the business of the firm?" Deponent said, "I would like to have twelve months to settle it up." Deceased continued writing for almost an hour, and then handed witness a paper to read, and then asked witness to go with him to *Gray's* office, as he was going to have *Gray* prepare his will, which he asked deponent to witness and keep for him. They went to *Gray's* office together, and deceased gave *Gray* a paper, and instructed him to draw therefrom a will. The paper was written on half a sheet, and was like the paper "JR." Witness further testifies, that subsequently on three or four occasions, at deceased's request, he went to *Gray's* office with him, for the express purpose of witnessing his will. The plaintiff further proved, that the deceased was very much attached to the plaintiff, and that between them there existed the closest inti-

macy, and that sometime about the 20th of June 1847, deceased said to *Mr. Selvage,* "*Elijah* always takes care of me, and I've left him snug"—or,—"I've made him snug." By *Mr. Sutton,* that on the 18th of July 1847, deceased and witness left *Baltimore* for *Bedford Springs;* that on the road, deceased said to him on one occasion, "*Boofter* has been a friend to .me, has been with me from the commencement of my forge in *Harford* county, has saved me a great deal of money, and I intend he shall be paid for it, and I have made provision for him and his family, if I never get back." After about two weeks, they started on their return to *Baltimore.* On the 2d of August, when near *Hancock, Mr. Rogers* was attacked with illness. It was found impossible to proceed, they stopped at *Hancock,* and the night of their arrival, *Rogers* became delirious, and knew no person except for a moment at a time, afterwards. He died on the 13th of August, and during his illness, on the second or third day after he was taken, *Boofter* came up from *Baltimore,* bringing *Dr. Gibson* with him, nursed the deceased constantly, until the day of his death, slept by his bedside, and came down afterwards with his remains to *Baltimore.*

The plaintiff also offered in evidence the inventory of the deceased's estate, and the first administration account showing a balance due the estate of $12,815.54.

And proved that deceased died without issue and unmarried, leaving one sister of the whole blood, *Mary Ann Magraw,* and one sister, and brother of the half blood, *Martha K. Hartshorn* and *Evans Rogers,* the persons mentioned in the paper "JR." And further proved by a number of witnesses, the great attachment of deceased to the plaintiff, that they were constantly together, that deceased often said "*Boofter* would do any thing for him, would act in any menial capacity to serve him."

The plaintiff further proved by a number of witnesses, and among others, by *Mr. Abbott,* his partner, that deceased was of perfectly sound mind up to the time of his leaving *Balti. more* for *Bedford Springs,* that though his mind had become impaired by intoxication, it was entirely fit for the transaction of

business when sober; that they did business with him, and that they would have had no hesitation in taking a deed from him; that in the spring of 1847, he went to *Philadelphia* and *New York*, for the purpose of making contracts and purchases for the firm.

The defendant then offered evidence by a number of witnesses, that deceased had been of unsound mind for six months or longer preceding his death; that his mind had become greatly impaired by the long use of intoxicating drinks, and that for six months preceding his death he was incapable of attending to business; and proved by *Dr. Thomas*, that he attended deceased during a spell of sickness in September 1846, that he then considered him, through feebleness of intellect, incapable of executing a valid deed or contract; that his mind seemed greatly impaired from hard drinking; that in the judgment of witness, his mind could not recover its strength if the same habits were continued. The defendant then offered evidence by a number of witnesses, that deceased continued his intemperate habits, from the time of his recovery from said spell of sickness until his last illness, and that he became more and more intemperate, and that during the last six months of said period he was incapable of executing a valid deed or contract; and proved by *William Wetherall*, a book-keeper in the firm of *Rogers* and *Magraw*, that in the spring of 1847, *Gray* the witness on the part of plaintiff, came to the counting house of said firm, that deceased seeing *Gray* approaching remarked to witness, "I know what that man wants, I will not do it;" deceased then went out of the counting room and conversed with *Gray* within sight, but out of the hearing of witness; and returned in a few moments much excited, and said to witness, "some people must take me for a fool, but they will find themselves mistaken, I wish you to take notice, that I will not sign that paper, I want my father to have the disposal of all my property when I die, he will know best what to do with it." that some weeks after the death of said *Rogers*, witness and a *Mr. Hartshorne* went with defendant to the office of *Gray*, who on request delivered to defendant the paper "JR," and

7        v.9

stated, that he had gone to the store of deceased with a will prepared from the paper, but that the deceased refused to sign it." And proved by *Mrs. Hemphill,* that deceased was very warmly attached to his father, the defendant, and to his sister, *Mary Ann Magraw;* that deceased on several occasions, within a year before his death, had declared to witness, his aunt, that he intended to make a will, leaving all his property to his sister *Mary,* his father to take care of it for her. And further proved by *Mr. Van Horne,* the innkeeper at *Hancock,* where deceased died, that *Mr. Sutton* said to deceased, "hadn't you better make a will," and he replied, "its not necessary, all I have will go to my sister *Mary.*" *Mrs. Van Horne* the innkeeper's wife and *Dr. Wilson* the attending physician, both corroborate the last witness as to the use of this expression by deceased, at that time and place, and that when this declaration was made, the mind of the deceased was more composed than at any other time during his last illness, having been calmed for the time by medicines.

.   Whereupon the plaintiff prayed the court to instruct the jury: 1st. If they believe from the evidence that *Rogers* placed in the possession of *Gray,* the paper "JR," with directions to draw therefrom his will, and that said paper contained his wishes with regard to the disposition of his property, and remained in *Gray's* possession, and that *Rogers* called on one or more occasions to execute a will drawn in conformity with his said directions, and that from any failure on the part of *Gray,* to prepare or furnish the paper, it was not executed, then the jury are bound to find as to personal estate, for petitioner upon both issues, unless they shall believe that subsequent to the time of placing said paper in *Gray's* possession, *Rogers* changed his intention, and did not design at the time of his death that his will should be in conformity with the instructions contained in said paper.

2nd. If they find that *Rogers* fully meant and intended to execute a will of the same tenor with said paper, and was prevented from carrying that intention into effect by the act of God, or by any contingency not imputable to any change of

intention on his part, then the jury are bound to find for petitioner.

3rd. If they find that *Rogers* desired and instructed *Gray* to prepare his will, and that his wishes as to the disposition of his property were contained in said paper, and that *Rogers* died without any change of intention on his part, but adhered to his wishes as contained in said paper, then said paper is his will, and the jury are bound to find for petitioner.

4th. If they find that *Rogers* handed said paper to *Gray*, and directed him to draw a will in conformity thereto, and that it remained in the possession of *Gray* until after the death of *Rogers*, and that the instructions therein contained were unobjected to by *Rogers*, then it is his will, and the jury are bound to find for petitioner.

5th. If they find that *Rogers* designed to execute a will of the same tenor as said paper, and then, or afterwards, designed that said paper should have effect as his will, even if not formally executed, said paper is his will, and there is no evidence of the revocation thereof, and the jury are bound to find for petitioner.

6th. If the jury find that said paper was handed by *Rogers* to *Gray*, with instructions to draw therefrom a paper, which he proposed to execute as his will, and that said last mentioned paper was so prepared, then his intentions remaining unchanged, said paper so prepared was his will, and the bequests therein contained are valid as to personal estate.

7th. If they find the facts stated by *Gray*, and that from the mere neglect or delay of *Gray* to prepare or furnish the same, a more formal paper never was signed, and that *Rogers* continuously desired and wished to execute a paper carrying out his wishes, as contained in "JR," without any change or deviation, and the day before he left for the springs, he called upon *Gray*, for the purpose of signing the more formal paper, which was not produced from having been lost or mislaid, and that he then announced that "JR," contained his entire wishes as to the disposition of his property, and that he would sign the more formal paper upon his return, and if the jury shall

further find, that within three or four weeks thereafter, he died, adhering to the said disposition of his property, as manifested by the paper "JR," then they are bound to find for the petitioners.

8th. If they find that the deceased fully meant and intended to execute a will, of the same tenor with "JR," and was only prevented from carrying that intention into effect, by extrinsic circumstances, such as he himself had no control over, and such as are not justly imputable to any change of intention on his part, then the jury are bound to find for the petitioners.

And the defendant also prayed the court to instruct the jury:

1st. Although the paper "JR," was prepared and delivered as stated by *Gray*, yet it is not the last will and testament of deceased, unless the jury shall further find that it was intended by deceased to operate as his will in its then state and condition.

2nd. That to authorize the jury to find that said paper is the last will and testament of deceased, they must be satisfied by the evidence that it was written by *Rogers, animo testandi*, and intended, as it stood, to be his last will and testament, without looking to any thing further to be done in order to be perfected.

3rd. That if the jury find that *Rogers* in his last illness, and after his several interviews with *Gray*, was requested, solicited, or advised, to make a will, and that he declined to do so, and declared that it was unnecessary, and that he designed that all the property he might die possessed of, should go to his sister, *Mary Magraw*, and that at the time of so declaring and declining, said *Rogers* understood what he was saying, their verdict must be for defendant, upon both issues.

4th. That "JR," is not the will and testament of *Rogers*, even though the jury shall find the facts detailed by *Gray* and the other witnesses of the plaintiff, provided they believe from the evidence that said paper was placed by *Rogers* in the hands of *Gray*, as instructions to prepare a will to be thereafter executed by *Rogers*.

The court (FRICK C. J.,) granted all the defendant's prayers, and refused the plaintiff's, who excepted, and the verdict being against him, appealed to this court.

The cause was argued before CHAMBERS, SPENCE, MAGRUDER, and MARTIN, J.

By WM. B. PERINE and RICHARDSON, Attorney General for appellant, and

By NELSON and YELLOTT, for the appellee.

The prayers made by the respective parties in the county court, indicate the points urged in argument in this court.

MAGRUDER, J., delivered the opinion of this court.

The issues in this case certainly are not those which are usually sent from the orphans court, for trial by jury, in cases of this description; and are so framed, that a verdict in favor of the petitioner, which was sometimes asked, would have been of no advantage to the appellants. They do not, indeed, refer to the paper, JR. No other paper, however, was produced; no attempt was made to prove that any other, which could be regarded as the last will and testament of the deceased, was in existence.

In order to make a paper the last will and testament of a deceased person, at the time it is written, it must appear that such person possessed the *animum testandi*, at that time.

A paper, although not a last will and testament at the time it is written, may be made such afterwards, by adoption.

A paper, though intended merely as instructions, or a memrandum to enable the scriviner to prepare a will, if the more formal act be left unfinished, may be made a will, by any act which the law pronounces to be the act of God. 2 *Eccl. R.*, 144. 6 *Eccl. R.*, 19. 2 *Addams*, 490. 5 *Eccl.*, 188. There must, however, be a continuance of the intention of the deceased, down to the time when the act of God prevented the execution of the formal instrument. An immediate, sudden death, is not required, if according to the proof, the jury are satisfied, that there was no change of intention, in regard to the provisions of the will.

In the case of *Tilghman vs. Stewart*, 4 *H. & J.*, 156; and *Brown vs. Tilden*, 5 *H. & J.*, 371, the court had not the aid of a jury, and was to settle the facts as well as the law. In pronouncing their judgment they necessarily decided questions, the decision of which, in the trial of issues by a jury, belongs exclusively to the latter. An instruction given to a jury, is not necessarily correct, because it is given in the very words which the court of last resort used in a case wherein they acted both as judge and jury.

With this understanding of the law, we proceed to notice the prayers of the appellant, in the course of the trial of these issues.

The court was correct in refusing to give the instructions asked by him, because all of these instructions take from the jury the inquiry, whether the deceased, at the time of preparing the paper, or at any other time, to which the prayers refer, was of sound and disposing mind and memory, and capable of making a valid contract? There certainly was testimony going to question his sanity, and of the weight to be given to that testimony, the jury were to be the judges. So if the design of any of the prayers was to obtain an instruction, that the paper, though not originally intended as a will, was afterwards made so by adoption, or because without any change of purpose, he was prevented by death from executing a more formal instrument, the prayer ought to have been so framed as to inform the jury of what the evidence must satisfy them, in order to warrant a verdict, establishing JR, or any other paper, as the will of the deceased. It does not appear that in this case any attempt was made to satisfy the jury, that it was obtained by fraud, or the exercise of undue influence.

It appears to the court, that a similar objection is to be made to the prayers of the appellee. If it be a question, made so by the proof, whether the paper JR, became, by adoption afterwards, the will of the deceased, or whether it became his will by the act of God, as before stated, the instruction should have informed the jury, what they were to find from the testimony, in regard to it, in order to obtain a verdict, that such paper was

not what the petitioner alleged it to be. If, from the proof, the jury could find, that it became at any time such last will and testament, there are defects in the prayers of the appellee, because of which the instructions of the court must be decided to be erroneous. A paper, though intended merely as instructions, or a memorandum to enable the scriviner to prepare the will, is to be admitted to probate, if the more formal will be left unfinished, by reason of any act which the law pronounces to be the act of God. 2 *Hag.*, 211. 6 *Eccl. R.*, 330.

There must, however, be a continuance of the intention, down to the time when the act of God intervened, and prevented the deceased from executing his purpose. When there is testimony to authorise a belief that there was no change of his intention, this question should be left to the jury.

To the first prayer it is a fatal objection, that according to it, the paper JR, could not be pronounced by the jury to be the will of the deceased, although the deceased never changed his purpose of so disposing of his property, and was prevented from executing a more formal instrument by his death.

The second declares that it is not to be considered his will, unless it was written by said *Rogers, animo testandi*, and intended, as it stood, to be his last will and testament, which, for reasons already given, is erroneous.

The third would take from the jury the power of deciding, *quo animo*, the declarations were made. They might have been intended to escape from importunity.

According to the fourth, the appellee would have been entitled to a verdict, if the testimony satisfied them, that the paper, "JR," was placed by said *Rogers* in the hands of *Gray*, as instructions to prepare a *will*, to be thereafter executed; and although he afterwards adopted it as his will, or was prevented by the act of God from executing a will, in all its provisions the same as the paper of instructions.

The court, therefore, agree with the court below, that the instructions asked by the appellant, ought not to be given; but says there is error in granting the instructions asked by the appellee. The cause is remanded for further proceedings, and a new trial.     CAUSE REMANDED