(Decided July 29th, 1859.)

---

# ABRAHAM BARNES *vs.* A. K. SYESTER, Ex'r of VIRGINIA W. MASON.

A paper was propounded for probate as to *personalty*, in which the testatrix, among other things, directed her executor to sell all her real estate in Washington county, Maryland, and apply the proceeds to the payment of certain specified legacies. It was written in her own hand, and *signed* and *sealed* by her. There were no *dates* in it, blanks being left for the purpose, and there was an *attestation clause* in the usual form but *no witnesses.* The paper was written about two years before her death, which occurred about two hours after a sudden attack, during which she was unconscious. She was a woman of intelligence, strong mind and will, of good business habits and had been specially instructed by counsel as to the necessity of having three witnesses to a will to pass real estate. At the time this paper was written, she had real estate in Washington county, all of which she *subsequently* sold and disposed of, and was about to execute the necessary papers to consummate, in legal form, the disposition of a part of it when she was overtaken by the sudden illness which resulted in her death. The paper was *endorsed as her will* and was found near the top of her travelling trunk, in the room at a hotel where she was staying at the time of her death, and this trunk also contained other papers, her watch, jewelry and clothing. There was evidence that she had said frequently, that all persons should make wills, and that she intended to make hers, and that, at another time, she said she had made her will, but whether this last declaration had reference to this paper or to one that she had executed some years before, does not clearly appear. HELD: That probate of this paper must be refused.

An attestation clause without witnesses, makes the paper an unfinished testament, even when the party has signed it, and the presumption of law is against such papers, and though a slight presumption it must be rebutted by extrinsic circumstances before the paper can be admitted to probate.

Barnes *vs.* Syester.

APPEAL from the Orphans Court for Washington County.

This appeal is from an order admitting to probate as to personalty, a paper purporting to be the last will and testament of Virginia W. Mason, deceased, propounded for probate by the appellee, the executor therein named.

The paper commences by declaring that "this is the last will and testament of me Virginia W. Mason, of Washington county, in the State of Maryland." By the first item thereof she gives her watch and chain to Thomson Mason, the eldest son of her brother, Melchoir B. Mason. By the second she gives all her clothing and a legacy of $100 to her old and faithful servant, Nelly Beender. By the third she makes provision for the manumission of all her servants at a certain age. By the fourth she gives all her silver to Mary A. M. Alvey, wife of R. H. Alvey, Esq., and then orders and directs her "executor, hereinafter named, to sell all my real estate, situated in Washington county, Maryland, and to make and execute a good and lawful deed, or deeds, of conveyance for the same, and to apply the proceeds as hereinafter mentioned." She then gives to "Mary King Wilcoxon, wife of Rev. Mason T. Wilcoxon, now living in Uniontown, Pennsylvania, and daughter of the late Richard B. Mason, of the District of Columbia, the sum of fifteen hundred dollars;" to William, Mary M., Francis and Richard M., children of William Dodge, $500 each; to Elizabeth M. and Sarah W., daughters of Dr. John O. Wharton, $900 each; to Elizabeth M., daughter of Abraham Barnes, $1000; to Louisa G. and Elizabeth M., daughters of John T. Mason, $800 each; to Thomas M., eldest son of Melchoir B. Mason, $1000. "And lastly, I hereby nominate, constitute and appoint, Andrew K. Syester, of Hagerstown, Maryland, my sole executor, of this my last will and testament, revoking and annulling all former wills by me heretofore made, ratifying and confirming this, and none other, to be my last will and testament.

" In testimony whereof, I have hereunto set my hand and affixed my seal, this ———, in the year of our Lord ———.

VIRGINIA W. MASON. ( Seal. )

"Signed, sealed and delivered by Virginia W. Mason, the

above named testatrix, as and for her last will and testament, in the presence of us, who, at her request and in her presence, and in the presence of each other, have subscribed our names as witnesses thereto."

Against the probate of this paper a *caveat* was filed by the appellant, a brother of the deceased, which was answered by the executor, and testimony taken before the Orphans Court, to the following effect:

The deceased died on the 6th of October 1858, having been in perfect health the moment before she was seized with her final illness, which was instantly followed by unconsciousness, and in about two hours by death. The testamentary paper exhibited was found in her trunk a few days after her death. It was upon two sheets of blue fools-cap paper, tied together with a red string, and folded up and endorsed in the handwriting of the deceased: "Last will and testament of Virginia W. Mason." She had several trunks at different places. In the one which was in the room at the hotel which she was occupying at the time of her death, this paper was found near the top of the trunk, by itself. The same trunk also contained other papers, her watch, her jewelry and clothing. The paper as well as the signature thereto, and attestation clause is in her own proper handwriting. The Rev. H. T. Wilcoxon and wife, named in said paper, resided in Uniontown, Pa., from May to August 1856, at which latter period he permanently removed from that place, with his family, and died in Baltimore, on the 30th of May 1858. The deceased and Mrs. Wilcoxon were intimate, and the former took a deep interest in the welfare of the latter, and they were much in the society of each other. Melchoir B. Mason had a daughter born on the 16th of December 1857, who was named Virginia, after the deceased, which fact the latter was aware of. She had no other nieces than those mentioned in this paper, except M. B. Mason's said daughter. Deceased sold her farm in Washington county, called "Richmond," containing about two hundred acres (which at the time constituted all her real estate in Washington county) to S. Zeller, on the 26th of November 1856, for between $9,000 and $10,000, and in part

satisfaction of the same, she got other real estate, estimated at about $1,500. This last mentioned real estate she had also agreed to exchange with Wm. Harvey for 320 acres Iowa land, and the bargain had been closed, except the execution of the necessary papers, in the afternoon previous to her death. The exchange was an equal one, excepting that Harvey was to allow $20 for the rent of a tenant house on the farm, and for which he gave her his due bill, which has not been found though diligent search has been made for it. Deceased was on her way to execute the necessary papers to consummate this exchange, in a legal form, when she was suddenly overtaken by death, as before stated. Her personal estate at the time of her death was worth about $4,500, exclusive of her negroes, and she owned land in Minnesota. About five or six years before her death she requested the appellee, a lawyer, to prepare a will for her according to her directions, which he did, and which was duly executed and attested. At the time he drew this will he instructed her as to the manner of executing it, and told her it was necessary to have three witnesses, to which she replied she knew it, and afterwards at her instance and request the witnesses thereto attested said will. In it the appellee was named executor, and a liberal bequest was made in favor of her brother Thomson Mason, who was then living. In July 1855, said Thomson died, and soon thereafter deceased again applied to appellee to prepare a codicil or new will for her, to which he replied, in substance, that as she had the form of a will in her possession, she might change it herself to suit her own views, to which suggestion she assented. No other testamentary paper has been found but the one exhibited. The relations between herself and her brothers and their families at the time of her death were kind and cordial, and so were those with Mrs. Dodge's family and Mrs. Wilcoxon, the two latter being first cousins once removed of the deceased. She spent a great deal of time at Mrs. Dodge's. About five weeks before her death she sold one of her slaves for misconduct. She was in the habit of conferring with her brother, Judge Mason, about her business matters, but never made any reference to a will. In 1856 she had no personal

estate of any material value, except her negroes, and her interest in the growing crops on her farm, nor had she up to the time of the sale of her farm to Zeller. She was a woman of intelligence, good business habits, of strong mind and strong will, and was about thirty-eight years of age at her death. Her trunks are in the possession of her brother, J. T. Mason, with their contents, and have been since her death, and in each of them are papers of more or less value. There were three bonds due on her farm from Zeller, two of which she had deposited in the Savings' Bank, for $1,000 each, and one with Mr. Kinkle, her agent, for the sale of her real estate, for $500. One of her trunks was left for safe keeping with Mr. Kinkle, in which was a portion, if not all, of her silver. The third trunk had been left with Dr. Wharton, her brother-in-law, in Baltimore. Deceased left, as her next of kin and heirs at law, three brothers, Abraham Barnes, Melchoir B. Mason, and John T. Mason, and the children of her deceased sister, Mrs. Wharton. She was particularly attached to her brother Thomson, now dead, of whom the appellee was a warm personal friend, and in his misfortunes paid him particular attentions.

*Mr. Harvey* testified that, to the best of his recollection, the contents of the due bill before spoken of, were as follows: "Ten days after date, I promise to pay Miss V. W. Mason, eighteen dollars, the same being due her as half year's rent on a State farm just exchanged for 320 acres of land located in Howard county, Iowa.                H. H. HARVEY."

*Mrs. Dodge* testified that deceased told her in the spring of 1855 or 1856, she does not remember which, she had made her will and showed witness the paper which she said was her will, but did not read it; witness cannot say the paper propounded is the paper so shown to her, but it looks like it. Since that time deceased has not told witness she had made her will, nor spoken of it. The trunks of deceased were brought to witness' house, where they were opened by Judge Mason, in her presence. The paper now propounded was found in the top of her travelling trunk, in one corner among her private papers. This was the trunk she always kept with

her. The other was brought from Baltimore, in which was packed her summer clothing. The paper was not in an envelope. The paper deceased showed to witness in 1855 or 1856, was blue fools-cap paper tied with a red string. The trunk when it was brought to witness' house and opened in her presence, contained her watch and jewelry. Witness thinks when she saw the paper deceased had brought it from the Clear Spring Post Office; she cannot be certain of it for it did not make much impression on her.

*Miss Schnebly* testified that the evening before her death deceased told witness she had disposed of all her real property in Washington county, by exchanging it with Dr. Harvey for Iowa lands, and expressed her intention to buy a small farm in Washington county, and go there to live. Witness heard deceased say many years ago that everybody should have a will and not wait till they died to make one, and that she intended to make her will one of these days. Witness has heard deceased say, time and again, that she intended to make her will and that she would leave witness something, but cannot say at what particular times she made these declarations. Witness and deceased were very intimate.

From the order of the court admitting the paper to probate as to personalty, the caveator appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK, and BARTOL, J.

*R. H. Alvey* for the appellant:

The paper, propounded for probate, makes some few specific bequests and provides for the liberation of her slaves. The main bequests are dependent upon the proceeds of the sale of the real estate directed to be sold. The legatees, to whom pecuniary amounts are directed to be paid, would be deemed devisees, *pro tanto*, because it is expressly directed that the proceeds of the real estate shall be the fund for their satisfaction, and, therefore, the personal estate would be exonerated. 11 *Ves.*, 185, *Hancox vs. Abbey*. 4 *Ves.*, 82, *Holford vs. Wood*. 2 *Drury & Warren*, 64, *Lamphier vs. Despard*.

Barnes *vs.* Syester.

2 *Spence's Eq.*, 342. This construction in connection with the fact that the deceased, at the time the paper was written, had no other fund than the land out of which the legacies could be paid, makes it clear that it was her intention to execute the paper formally, and in such a manner as to carry realty, or otherwise all the most considerable legacies would fail. The deceased was an intelligent woman. She understood perfectly well the formalities necessary to make her will effective as to her real estate. She made nearly the whole programme of her bounty depend upon the disposition of that character of estate. Can we then resist the conclusion for a moment, that she intended, at the time she made this instrument, to execute it in a formal and perfect manner, so as to effectuate her objects? If she did intend further execution of the instrument, and did not suppose at the time, that the paper would in its then form and condition operate as her will, or did not intend it so to operate, without further act or ceremony, then it cannot be received as a last will, unless it be shown that it was made so by subsequent adoption. 9 *Gill*, 53, *Boofter vs. Rogers.*

But were the legacies not so dependent upon the sale of the real estate, and were payable out of the personalty in the ordinary way, this paper affords abundant evidence, until repelled, of its own incompleteness and inchoate character, even as a will of personal estate, and, in the absence of evidence to repel them, we must argue this case upon the presumptions of original design as evidenced by the paper itself. In the testamentary disposition of personalty no form is necessary, if none be intended by the party. But if form be designed and attempted, it must be completed as projected. The question then becomes altogether material, whether every thing has been done that the party deemed necessary or intended? For, if not, the paper is incomplete and all the presumptions of law are against it. Here, it is evident, the deceased intended to do something more before she published the will. She was fully aware of the necessity of three witnesses to pass land. She had on a former occasion executed a will, when all the forms had been complied with, and, contemplating a similar

Barnes *vs.* Syester.

mode of execution, we find that, in the preparation of this paper, she added the attestation clause and left blanks for the insertions of the day, month, and year. Why were all these dates left blank? If her intention was to do nothing more to the paper, but to let it stand in its then condition, why did she not at once fill up the dates? Is it not plain that she left the blanks to be filled up at the time when she should, if ever, complete the instrument by formal execution? Why was the attestation clause added? She must have had a design in it, and that design was to have her will, if ever executed, formally attested by witnesses. And if she postponed the publication of the will to enable her to comply with forms even, or to effect a more formal execution, it is sufficient to show that her intention was not complete, that she had not at the time the *animus testandi.* This was so decided after thorough consideration in the case of *Walker vs. Walker,* 1 *Merivale,* 503.

Proceeding upon rational presumptions from the intrinsic evidence of intention, it has been frequently held, that if there be an attestation clause added, as here, at the foot of a testamentary paper, the inference is that the deceased intended to execute it in the presence of witnesses, and that it was incomplete in the apprehension of the party till that ceremony was performed, and consequently the presumption of law is against the paper, if it be not attested by witnesses as apparently intended. 1 *Phill.,* 19, *Scott vs. Rhodes.* 2 *Phill.,* 177, *Harris vs. Bedford.* 1 *Add.,* 154, *Beaty vs. Beaty.* 4 *Ves.,* 186, *Mathews vs. Warner.* 1 *Merivale,* 503, *Walker vs. Walker.* This presumption is held to be very much strengthened when the paper purports to dispose both of real and personal property. 1 *Hagg.,* 226, *In Re Herne.* 3 *Md. Rep.,* 142, *Plater vs. Groome.* And so the presumption against the instrument is still stronger, indeed almost incontrovertibly conclusive, where the unexecuted will creates a common fund of real and personal estate with which to pay legacies. Such presumption can only be overcome by very clear and certain evidence. 3 *Knapp,* 1, *Douglass vs. Smith.* 4 *Hagg.,* 183, *Elsden vs. Elsden. Ibid.,* 192, *Gillow vs. Bourne. Ibid.,*

199, *note* (*a*), *Tudor vs. Tudor.* The whole strength of this last measure of presumption bears against this paper. It not only creates a blended fund, of a personal and real character, but nearly the whole extent of the bounty is dependent upon the real fund.

If then this paper was not, at the time it was prepared, intended in its then form to operate as the last will of the deceased, without any thing more being done, at what time subsequently did the *voluntas testandi* exist in her mind ? The *onus* of showing the time when it existed, as to this instrument, is upon those who seek to sustain it as the last will, and in the absence of clear and unequivocal proof, the paper must fall. *Lord Loughborough* in his opinion in *Matthews vs. Ward,* 4 *Ves.,* 209, has disposed of this whole case upon the clearest reason. In speaking of an imperfect instrument then before him, he said: "Under all these circumstances, with this evidence, and *above all the evidence of the paper itself,* I would have no difficulty, sitting as I have sat in a court of law, to put it so to the jury that I should expect a verdict that he had not devised; that it was no will, but only a project of a will, not a complete, definite rule and law for settling his fortune. It is not, it cannot, be denied, the argument presses so strong, that upon the perusal of this paper, the natural conclusion is, that it was his intention to make a more formal paper than this. That inference cannot possibly be avoided. Then, *ex hypothesi,* this paper, at the time he subscribed it, was not *the* law, *the* testament. When then, at what period did the *voluntas testandi* exist in his mind, *quoad* this instrument ? If it is admitted, as it must be, that when he subscribed his name he was looking to some future act, the decision that this is his will would destroy the most general maxim I know of, *voluntas testatoris ambulatoria est usque ad mortem.* No man can answer the question, at what time that intention existed in his mind. I know there was a period when a contrary intention existed. He has given that evidence under his own hand by the paper of 1789." The same argument was adopted by Judges *Martin* and *Buchanan,* against the will of Steuart, in 4 *H. & J.,* 156. Whatever may have been the purpose of the deceased, at the

time of writing this paper, it is manifest, that there was a suspended intention in regard to it.

The fact of the paper being preserved in her trunk, in the state it was found, by no means evidences, either an original intention to constitute it her will as it stood, or to make it such by subsequent adoption. Upon the contrary, that fact rather militates against the paper. With constant and ready access to it, and without the slightest prevention, for more than two years it remained in its incomplete and unfinished condition, and is so left at her death. This fact is not consistent with the supposition of a fixed and final intention to make it her last will. The facts attending the paper propounded as the will of Steuart, are infinitely stronger to sustain the presumption of intention than the facts of this case. There the paper, in the handwriting of the deceased, was found in a place of the greatest possible security, giving evidence of great care and deliberation. These facts, coupled with the repeated strong declarations of Steuart, that he had made his will, and always kept a will by him, imparted considerable strength to the case, but yet the paper was rejected. I contend that the cases of *Tilghman vs. Steuart*, 4 *H. & J.*, 156, and *Plater vs. Groome*, 3 *Md. Rep.*, 134, are decisive of this. See also the case of *Clagett vs. Hawkins*, 11 *Md. Rep.*, 381.

As to the declaration made by the deceased to Mrs. Dodge, they can have no application to this paper. They were made at a time before the paper was in existence. Mrs. Dodge is not certain whether they were made in the spring of 1855 or of 1856, but whether made in the spring of the one year or the other, they were anterior to the existence of this paper. Mrs. Dodge says that the deceased got the paper out of the Post-office, a thing that could not well have happened with the paper in question, because it is in her own handwriting, and therefore always in her own possession. But had these declarations been made after the existence of the paper in question, instead of before, they would be worth but little in the scale of evidence. To show how much weight is due to evidence of such declarations, I cannot do better than to quote a passage from the judgment of *Sir John Nicholl* in the case of *Beaty*

*vs. Beaty,* already referred to, where that learned civilian said: "The mere vague declarations of testators that *they have made* their wills are not always to be implicitly relied on; *and can never, standing singly, supply proof of due execution, or, consequently, of what is to be taken in lieu of it.* In common parlance a man may well say, and possibly often does, that *he has made* a will, when he has written a testamentary paper, however incomplete or unfinished that paper may be." Judges *Martin* and *Buchanan,* in *Tilghman vs. Steuart,* expressed themselves to the same effect in disposing of the declarations proved to have been made by Steuart as to his having made his will.  *4 H. & J.,* 167, 175.

Since it has been decided by this court, in *Plater vs. Groome,* that the strong language used in *Brown vs. Tilden,* 5 H. & J., 371, in declaring for the paper there produced is to be understood as referring only to the particular codicil then involved, that case cannot be treated as an authority, and I shall not, therefore, undertake to show the great dissimilarity between this case and that. I shall submit this case on the authorities I have already cited, with this further remark, and the authority for it, that the rule is to be enforced with strictness in requiring satisfactory proof of the existence of the *animus testandi,* where formal execution appears to have been intended, and that the facility of establishing wills of personal property has been deemed an evil to be restricted rather than a good to be extended. 1 *Phill.,* 19, *Scott vs. Rhodes.* 4 *Ves.,* 210, *Mathews vs. Warner.*

*John T. Mason* on the same side:

It appears from the facts in the case, that at the time this alleged will was written, which was more than two years before the death of the testatrix, she was possessed of little personal property other than her negroes, and that at the time, her estate consisted almost entirely of *real property,* and that *she knew* this paper was invalid to pass real estate.

1st. It is clear that this paper was never valid to pass real estate.

2nd. It is admitted to be sufficient to convey personal property, if it were so intended when it was made.

3rd. Therefore, the only issue to be determined by this court is, did she intend the paper to operate as her will in its present form and condition?

4th. This inquiry is answered by one of the admitted facts in the cause, viz., that she knew the will was inoperative when it was made, and knowing it to be invalid, it is an absurdity to say that it was designed to accomplish that which the deceased knew it could not accomplish.

5th. The paper being worthless at the time it was made, because it lacked the essential element of having been intended to operate as a will in its then imperfect condition, some new subsequent act of the deceased was necessary to infuse virtue into it, such as republication or the like, which it never received. The paper must be regarded *now*, as it was when it was made, as a mere "project or plan for a will which was never adopted or carried into execution." 3 *Md. Rep.*, 145, *Plater vs. Groome.*

6th. The law requires, in regard to wills of personalty, no particular formalities, as in real estate, but it is essential that it should be proven beyond a question, that they were intended to operate as such in the condition in which they were written. The formalities of wills of *real estate* create a legal presumption of such intention, which, in cases of incomplete wills, must be supplied by direct proof.

7th. The purpose of the deceased, as foreshadowed by this paper, was to dispose of her *entire* estate. To apply the present paper to her personal estate alone, would be to defeat her purposes almost as effectually as to say she died intestate; practically, much more so.

8th. The cases of *Tilghman vs. Steuart*, 4 *H. & J.*, 156, and *Plater vs. Groome*, 3 *Md. Rep.*, 134, it is submitted, are conclusive of this case.

*A. D. Merrick* and *A. K. Syester* for the appellee:

If this paper had no attestation clause appended to it, it would clearly be entitled to probate, so far as personal estate is concerned. *Wms. on Exc'rs*, 56. 3 *Phill.*, 614, *Forbes vs. Gordon.* This point is also fully settled in Maryland by the

case of *The Visitors of the Free School in St. Mary's Co. vs. Bruce*, 1 *H. & McH.*, 509, where the will, as exhibited, was not signed by the testatrix, nor was it in her handwriting, nor attested by any witnesses, and the date was left blank, as well as the name of the executor, and it undertook to dispose of both real and personal estate.

There is no case in Maryland where a testamentary paper, *signed* by the decedent, has been refused probate as to the personalty. Although, at the time of writing this paper, the deceased owned real estate in Washington county, and although this paper directs that estate to be sold by the executor, yet in reality, at the time of her death, she had nothing but personal estate to dispose of. On the day before her death, she exchanged the only lands she possessed in Washington county for Iowa lands, with Dr. Harvey, and a due bill was given to her by him for a sum of money due her on the exchange, as for rent for a tenant house, and in this due bill the fact of the exchange was recited, and the terms upon which it was made, expressed. This was a sufficient memorandum in writing within the statute of frauds. *Chitty on Cont.*, 70, 71, 300. 1 *H. & G.*, 139, *Higdon vs. Thomas.* This, too, was the opinion of the deceased, who, on the evening before her death, told a witness, not that she was about to sell, but that she had sold all her Washington county lands. The evidence in the cause and the reasonable conclusions to be drawn therefrom, show, moreover, that from the time of the writing of this paper up to the day of her death, the deceased was steadily engaged in converting all her real estate into personalty, and that she commenced negotiations for the sale of her real estate as early as May 1856, in which month this paper was probably written.

In the case of *Plater vs. Groome*, 3 *Md. Rep.*, 134, the court say: "To constitute a good will for personal property, the paper must be either complete on its face, or it must appear, if incomplete or defective, that it was intended by the testator, that it should operate as his will in its unfinished and imperfect state, or that he was prevented from completing the contemplated formalities by being overtaken by sickness or death,

or some other casualty.  In all cases of imperfectly executed testamentary papers, like the present, it must appear that the deceased possessed the *animum testandi* at the time it was written, and that he intended and supposed the paper, as it stood, to be his will, without looking to anything further to be done in order to perfect it.  *Tilghman vs. Steuart*, 4 *H. & J.*, 173.  Upon these general principles, which we think are sustained by all the authorities, the present controversy must be settled." An examination of the case of *Tilghman vs. Steuart*, here referred to, will show the nature of the imperfection alluded to.  The paper in that case was not only unattested by witnesses, but was unsigned by the testator, and blanks were left for the names of the legatees, thus bearing on its face the most glaring imperfections, which it was impossible to explain or account for, except on the hypothesis that the *animus testandi* did not and could not have existed in the testator, either at the time of writing the paper or at any subsequent period.  Although it may be conceded that the imperfections and omissions upon the face of the paper in that case were such as to show conclusively there was at no time a fixed *animus testandi* in the testator, and consequently that the paper was rightly rejected, yet the reasoning of *Judge Johnson* shows conclusively that the doctrine sought to be established in this case was not then even urged before the court.  He says: "Against the validity of the will it has been contended, that notwithstanding the ancient decisions may have supported such instruments, the modern determinations establish a different doctrine, and where the paper in question, on its face, carries evidence of an intention in the framer to perfect it by some further solemnity which he has died without having superadded, having had afterwards sufficient time and health to complete it, such paper may be inferred not to have been intended to operate as it stood, and the omission to perfect it may ground a presumption of a change of mind in the deceased. *Roberts on Frauds*, 453.  If the position thus advanced was to be received in its full extent, the consequence would follow that no will, designed to pass real and personal property, where an intention on its face was manifest that it was designed to

have been executed in conformity with the statute, could be effectual to pass the personal property, although signed and sealed by the testatator; for as it would be apparent on the face of the paper, witnesses were designed to be obtained, the not procuring them would justify, according to the position, the inference of a change of mind on the part of the deceased. *To this extent the principle has not been urged in this cause.*" 4 *H. & J.,* 169. See further upon the distinction drawn between testamentary papers unfinished and imperfect on their face, and those that are merely defective in their manner of execution. *Wms. on Exc'rs,* 61; 2 *Add.,* 354, *Montifiore vs. Montifiore.* But even if the *animus testandi* does not exist at the moment of writing a paper, a subsequent adoption or recognition of it as a will, will be sufficient. 9 *Gill,* 44, *Boofter vs. Rogers.* In this case, the signing of the paper by the deceased is a circumstance sufficient to render it *prima facie* a valid will as to personalty. In *Barnet's Appeal,* 3 *Rawle,* 15, it was laid down by *Chief Justice Gibson,* that "where a paper contains *the substance of a will,* with the usual act of execution subjoined, although without the names of subscribing witnesses, the fact that it was thus found in the decedent's possession, ought, without actual publication, to be taken for *prima facie* evidence of its having been adopted as a testamentary act. But where, on the other hand, it is destitute of every formal act of authentication, the presumption ought to be adverse, in the absence of proof of an actual publication, or of any other act of recognition, equally satisfactory." In illustration of the same principle as to the presumption to be drawn from a party's signature, to take an agreement out of the statute of frauds, *Lord Cowper* observes, "that he knew of no case where an agreement, though all written with the party's own hand, had been held sufficient, unless it had likewise been *signed* by him; that the party's not *signing* it was evidence that he did not think it complete; that he had left it to an after consideration, and might make alterations or additions in it; therefore, *unless it was signed by him,* or something equivalent done to show that he looked upon it as completed, he thought such writing by the party himself was not

sufficient to bind him within the statute." *Bawdes vs. Amhurst, Prac. in Chan.,* 402.

The paper under consideration was either, 1st. A mere project or draft of a will. 2nd. A revoked will; or, 3rd. The genuine will of the deceased. Now, first, was this a mere project of a will? Upon an examination of the paper, we find that the amount of all the legacies bequeathed by it is precisely $10,000, and there is no residuary legatee. The deceased evidently intended to make a complete disposition of all her property by this paper, as her "Richmond Farm" was sold on the 26th of November 1856, for between $9,000 and $10,000, which was all the land she then possessed in Washington county. Adam Kinkle was her agent in the sale of this farm, the negotiation for which was pending for about five or six months before it was concluded, and must, therefore, have been commenced as early as May 1856. This paper must have been written some time between May and August 1856, as the Rev. Mr. Wilcoxon, who is therein mentioned as residing in Uniontown, Pa., only lived there between those periods. Mrs. Dodge testifies that in the spring of 1855 or 1856, she does not remember which, (but other circumstances show that the latter date was the correct one,) the deceased told her she had made her will, and, at the same time, produced a paper in all respects resembling this, which she declared was her will. Another prominent fact, taken in connection with previous ones, is, that another will had been prepared, according to the directions of the deceased, some three or four years previously, and, soon after the death of Thomson Mason, in July 1855, who was a brother of the deceased, and to whom a liberal bequest had been made in this will, she applied to her attorney to prepare her another will. He told her that as she had already the form of a will in her possession, she might change it to suit herself. Now, from a comparison and examination of all the facts together, is not the conclusion almost irresistible that the deceased, after this interview with her attorney, and in accordance with his suggestions, to which she assented, did prepare this will to suit her own views, which had been changed and, n part, frustrated by the death of her

brother, and when she exhibited it to Mrs. Dodge, and declared it to be her will, in the Spring of 1856, and when she endorsed upon it the words, "Last will and testament of Virginia W. Mason," it was recognized and adopted by her as her *bona fide* will? The endorsement upon the paper is a declaration of the strongest and most emphatic kind, not to particular persons, but to the whole world, that it was really and truly, at the time, the will of the deceased. In no possible view of this case, can this paper be looked upon as a sketch or project of a will, to be afterwards considered upon and then filled up by the testatrix in accordance with her completely formed wishes. On the contrary, the careful manner in which it was prepared, the particularity and minuteness of its dispositions, the nice arithmetical exactness with which the whole amount of legacies is made to correspond with the value of her estate; even the peculiarities of some of its dispositions, and its solemn recognition, afterwards, by the decedent, all go to show that it was no project or draft, like the paper in *Tilghman vs. Stewart*, but was, at the time of its writing, endorsement and subsequent recognition, a true will, and, it may be added, a will that had been most carefully prepared, calculated and meditated upon.

Nor can this paper be considered as a revoked will, for if it once be conceded that it was, at any time, the genuine will of the deceased, the burden of proof to show that it has been revoked is thrown on the other side, and there is a total absence of evidence even tending to show such revocation. On the other hand, the deceased, from the very moment the paper was written, which was probably in May 1856, up to the day preceding her death, was engaged in the conversion of all her real estate into personalty, thus rendering the present paper, which was the genuine expression of her wishes regarding the disposal of her property, but which would not have been valid under the statute as a disposition of real estate, perfectly valid as it stood, *without the attestation of witnesses.* At the time it was written she owned real estate in Washington county. She knew what were the requisites of a good will to pass real property, and she knew, therefore, that this paper might be

perfected in two ways: 1st, by its due execution, attestation and publication; or, 2nd, by the conversion of her real estate into personalty, which would in no wise interfere with the provisions of her will, since its bequests were all specific sums of money. This latter method she adopted and completed, and thereby dispensed with the necessity of having the paper attested by witnesses. These facts, we think, are a sufficient reply to the argument the appellant attempts to derive from the fact that at the time this paper was written the deceased had no other fund than land out of which the legacies could be paid.

Many years before her death, and at different times, the deceased declared that everybody should have a will and not wait until they were about to die to make one, and her subsequent conduct proved that these declarations were afterwards made a rule of action for herself. As soon as her first will became inoperative by the death of her brother, we see her anxious to have another prepared. She accordingly writes the present paper and destroys the first will, as must be reasonably presumed from the fact that it cannot be found. Now, why did she destroy her first will if she did not intend the second should stand in its place, or why was not the second destroyed if she had ever changed her mind as regards its provisions? It may be said, on the other side, that her sudden death prevented her destroying the present paper; but is it not at least as likely that this was one of the principal causes, if not the only cause, why it was not fully attested?

We have thus endeavored to show that from the facts and circumstances attending this case, it differs very materially from those of *Tilghman vs. Steuart* and *Plater vs. Groome,* which are the main authorities relied on by the appellant, and consequently that the rejection of the papers in those cases cannot affect this. On the contrary, we rely upon all the Maryland authorities on this subject which have been cited by the appellant, as sustaining our views. Even the modern English cases cited on the other side, would not, as we conceive, warrant the rejection of this paper. These cases all hold that the presumption arising from an unexecuted attestation clause,

against the instrument, even when the paper is unsigned, is but slight, and may be rebutted by slight circumstances. The case of *Watt & Leroy*, 4 *Wend.*, 168, is very similar to this. In that case a testamentary paper found in an iron chest among valuable papers, of a person deceased, *without signature*, having an attestation clause *without witnesses*, written by the deceased, evincing much deliberation and foresight in its provisions, and disposing of both real and personal property to a large amount, was received as a valid will as to personality. The following propositions were there laid down: 1st. That, according to the common law, as generally received and understood in England as well as in this country, up to the time of the American Revolution, the paper propounded as a will in that case would have been admitted to probate although it was not signed by the testator, at the end thereof, had an attestation clause and was unattested; and 2nd, that although according to the modern decisions in the Ecclesiastical Courts of England, if there be an attestation clause to the paper propounded as a will, and it be unattested by witnesses, such clause raises a presumption against the paper as furnishing proof that a further act was contemplated to be done, still such presumption is but slight and may be rebutted by slight circumstances. And, after examining that case tested by these principles, the Chief Justice comes to the conclusion "that the paper produced should be admitted to probate, as in his opinion the circumstances fully rebut the slight presumption arising from the non-execution of the paper in the presence of witnesses."

In conclusion it is to observed, that the *unexecuted attestation clause* is laid hold of by the appellant as the material and controlling circumstance to defeat the validity of the instrument before us as a will. All the authorities concur in the doctrine, that the presumption arising against the validity of such an instrument from the unexecuted attestation clause, is but *slight*, and that but slight circumstances will rebut it. In the case of *Watts & Leroy*, just referred to, extrinsic and intrinsic circumstances were considered, and the deliberation and foresight displayed in the preparation of the paper in that

case with the fact that it was found in a place of security, were held sufficient after the most mature argument and deliberation to rebut the presumption of law against it, arising not only from the unexecuted attestation clause, but also from the fact that it was *unsigned* whilst there was a seal attached. In this case the paper is signed and sealed; the deceased treated it as among her most valuable articles; she left it in a place of the greatest possible security, compared with the manner and places in which her other effects were kept; we find it among her valuable and esteemed articles of jewelry, along with her *private papers* which she kept always with her in her travelling trunk. Similar and like circumstances have always been held as very powerful to overthrow even stronger presumptions of law, than the bare circumstance of the non-execution of the attestation clause. 1 *Phill.*, 345, *Bone vs. Spear.* 2 *Phill.*, 122, *Read vs. Phillips.* *Ibid.*, 177, *Harris vs. Bedford.* 3 *Phill.*, 323, *Buckle vs. Buckle.* *Ibid.*, 614, *Forbes vs. Gordon.* 1 *Add.*, 383, *Warburton vs. Burrows.* 2 *Add.*, 42, *Doker vs. Goff.* 3 *Rawle*, 15, *Barnet's Appeal.* The presumption of law arising from the circumstance we are contemplating, is not only as we conceive, entirely overcome by the pregnant facts of the present case, but the circumstance is itself susceptible (in connection with other facts) of an easy and most reasonable solution, without having recourse either to the supposition of an immaturity or change of testamentary intention. We think it may be explained altogether consistently with the existence of the *animus testandi* in regard to this paper. For instance, when this paper was written (probably before) the deceased was engaged in selling her Richmond Farm, comprising *all* her real estate in Washington county, and it was manifestly her intention to convert all her realty into personalty. This purpose she industriously and perseveringly pursued up to the very hour of her death, when it was accomplished. This realty is worth $10,000, the exact amount of the legacies bequeathed. She had this purpose in view at the time, if not before, the writing of the instrument we are considering. She well knew that when that event should be accomplished no witnesses would be necessary to

Barnes *vs.* Syester.

the validity of her will.   We submit that these facts do demonstrate that she regarded this paper as containing her will, that in its existing form it should so operate, and that the attestation clause was to be executed only in the event of her dying possessed of real estate in Washington county, an event which her own active, diligent and persevering exertions at last finally defeated.

Upon the strong facts in the record, which we have endeavored to present to the court, and relying upon the authorities cited, and the uniform course of decisions in Maryland, we submit the case.

Tuck, J., delivered the opinion of this court.

It has been regretted that more strictness has not been observed in the admission to probate of testamentary papers. To meet the apparent hardship of particular cases doctrines have been engrafted on the law, which have caused as much injustice in other instances as their introduction was designed to prevent, and, we think, it may be suggested as a probable consequence of some decisions, that, by the failure of courts to ascertain the real intent of the deceased, wills were made for persons who in fact had died intestate.   Among the most difficult duties we have to perform is that of passing upon unfinished, imperfect, and informal papers, in the nature of wills, and it is greatly increased when the intention of the maker is to be gathered from the varying, and often conflicting, statements of witnesses, detailing declarations and acts, of uncertain import, at different times, the correct interpretation of which must depend on collateral circumstances into which the tribunal to decide the question cannot enter.   And, if, for a solution of the difficulty, resort be had to adjudged cases, we find eminent jurists differing in their conclusions, though drawn from the same or similar acts and words, according to the peculiar facts disclosed at the time they were done or uttered, and, in some cases, invoking, not merely the *res gestœ* of the transaction, but, the conduct of the testator during his whole life, as far as it may appear to have had relation to the act in question.   The decision of the present case is attended by

these embarrassments, called upon, as we are, to pronounce for or against what is propounded as the last will of a woman shown to have been of intelligence, strong mind and will, of good business habits, and specially instructed by counsel as to the requisites to give full effect to such an instrument as the one before us, when she is no longer here to speak for herself. The paper in question was drawn by Miss Mason, and is effective to accomplish the purposes indicated, except that, though signed and sealed, it has no date, blanks being left for the purpose, and there is an attestation clause in the usual form, but no witnesses. The time of the writing may be inferred from extrinsic facts, and the signing does not appear to have been at any other time than when it was written. If done, at that time, it is plain that, if she designed the will to operate on all the property mentioned, she must have looked to the further act of supplying the dates and publishing before witnesses. It was endorsed as her will, and found near the top of her travelling trunk, in the room at a hotel where she was staying at the time of her death, which occurred two hours after a sudden stroke, during which she was unconscious. The trunk also contained other papers, her watch, jewelry and clothing. One witness proved that she had said, frequently, that all persons should make wills, and that she intended to make hers some of these days, and, another, that she said she had made hers, but whether this last declaration had reference to this paper or to one that she had executed some years before does not clearly appear. There is other evidence, from which it may be inferred, that she did not intend to die intestate, but the question before us is, whether she designed this paper to operate as her will, as to the property which by the law it could effect, notwithstanding it might fail of effect as to other property. And, when we consider all the facts and circumstances belonging to the question, and the principles of law governing cases of the kind, we think that conclusion cannot be drawn with the certainty which the law requires when it is attempted to disinherit those, who, in the absence of a will, are entitled to take.

If the present paper had not been signed by the party we

could not hesitate to reverse the order of probate, on the authority of *Plater vs. Groome*, 3 *Md. Rep.*, 134. It is well settled that an instrument, like the present, is to be classed among unfinished testaments, on account of the attestation clause without witnesses, even where the party has signed it; that the presumption of law is against such papers; and, though a slight presumption, must be rebutted by extrinsic circumstances, in order to its being pronounced for. This doctrine is fully stated in the case of *Beaty vs. Beaty*, 1 *Addams*, 154, (2 *Eccl. Rep.*, 60,) which in some respects was like the one before us, with the additional fact that the will was dated, and the testator had said that he had destroyed his former will and made a new one. In *Harris vs. Bedford*, 2 *Phill.*, 177, *Sir John Nicholl* said: "From the circumstance of there being no witnesses to the attestation clause, the court is bound to presume that the deceased intended to do some further act—certainly the paper is imperfect—and the presumption against it must be repelled, either by its being shown that he intended it to operate in its present form, or that he was prevented from finishing it by the act of God." In *Modern Probate of Wills*, 56, of unfinished or informal papers, it is said, "that the law on this subject is inflexible." The same principle was recognized in 4 *H. & J.*, 156, *Tilghman vs. Steuart*, and 3 *Md. Rep.*, 134. It may be observed also that the authorities treat the attestation clause as a more pregnant circumstance when drawn by the testator. Applying this rule of interpretation we do not consider the facts relied on by the caveatee as sufficient to repel the presumption, that, at the time of writing and signing the paper, Miss Mason intended to do some other act to give efficacy to it as her last will and testament; on the contrary there are circumstances having a very strong bearing the other way.

She had real estate at the time the will was written, which must have passed to the executor for sale, in order to effectuate the intent as to those very legatees who appear to have stood in the tenderest relations to her; yet she did not give the paper that effect, by a formal execution *per testes*, and if she had then died the will could not have been

67      v. 14

fully carried out. But she actually sold this very land, out of which alone, at that time, the legacies could have been satisfied. Did she by that act design to affect those bequests, and that the others should operate? It is impossible to say. The most we can do is to speculate about her intentions, and, that which appears to be as reasonable as any other, is that, as the treaty for the sale of the land commenced about that time, it was her purpose to postpone the consummation of the act, in order that when executed it should be so altered as to operate on all her property according to its then condition, because the will disposes of all she had, and shows an intent not to die intestate as to any of her property. Although the land acquired from Zeller, in exchange, on the sale of "Richmond" would have gone in aid of the legacies that were affected by the sale of that farm, yet the land in Iowa, obtained from Dr. Harvey, would not; and, as the Zeller land was disposed of to Harvey, there was none in Washington county, on which the will could operate. Hence, we see that if the paper had been executed these transactions must have defeated the intent expressed in it, so far as the legacies were to have been paid by a sale of land. As, in all the varying conditions of her affairs, during the two years and more that elapsed between the supposed writing and signing of the paper and her death, such as exchanging lands in Washington county, then for lands in another State, and buying land in a third State, probably with the proceeds of the Richmond farm, she never executed a will with the formalities that she was aware were necessary for the purpose of accomplishing what this paper shows she at one time intended, we think there was only a floating, unsettled purpose in her mind which she might or might not accomplish, in one way or another, as might be most expedient at the time of completing the act.

If it had appeared that she signed this paper after the sale of the Richmond farm, when she must have known that it could not affect the land, there would have been ground for the presumption that she designed it to operate, in its then unfinished form, as far as by law it might, but, even then, the dates probably would have been supplied, so as to show the time of such change of intention.

Barnes vs. Syester.

Much reliance was placed on the fact that the will was found in her trunk with valuable articles. Now, the place of deposit is always an important fact, but not a controlling circumstance. Mrs. Edmonson's will was more carefully put away, and also that of David Steuart, (3 *Md. Rep.*, 134, 4 *H. & J.*, 168,) but the inference sought to be deduced was overcome by other other evidence. Is it not quite as probable that in the fluctuating state of her property the will was kept near her person in order that, when her affairs assumed a settled condition, she might make another, or execute that one in due form of law? A travelling trunk cannot be considered the usual depository of a will, made and intended to operate as a final disposition of one's affairs; they are commonly confided to the safe-keeping of others, or carefully put away. As we have said, her property was undergoing changes. She said to one witness that she intended to buy a farm and settle in Washington county, but on the day before her death, instead of selling and buying again, she agreed to exchange her land for land in Iowa, thereby parting with all the realty on which the will could have operated for payment of the legacies, when she had in personalty, exclusive of negroes, not more than enough to satisfy half these bequests. She probably intended to have made a will after the exchange of the title deeds, and, on that supposition, the place where it was found is the one where she would most likely have kept it. It was not even carefully put away, but lying open near the top, easy of access when wanted. Considering her mode of living, with trunks containing valuables at other places of deposit, it is more reasonable to suppose that she did not consider it as her final disposition of property. The law in such cases treats the paper as merely evidence of an inchoate intention of what she designed, and we must dispose of it in the imperfect condition on which it is propounded for probate. We may thus defeat bounties which the deceased, doubtless had much at heart; but, though to be regretted, it cannot be avoided consistently with the principles of law to which it is the duty of the court to adhere.

*Order reversed.*

(Decided July 30th, 1859.)