ANN HARRIS *vs.* CHARLES R. PUE, JR., Administrator, c. t. a. of CHRISTOPHER HARRIS, deceased.

*Competent Witness under the Act of 1864, ch. 109 — What is a sufficient Testamentary disposition of Personal property — Bequests in blank.*

Under the Act of 1864, ch. 109, a beneficiary under a will is a legal and competent witness to sustain it.

A paper purporting to be a testamentary disposition of the personal property of H. he having no real estate, was written at his request and by his dictation, at a time when he was in the full possession of his faculties, was signed by him in lead pencil in the presence of his wife, after he had carefully read it, was kept in his possession, and after his death was found in the place where the wife herself had put it *as his will.* A duplicate of this paper was prepared at the request of H. was executed by him at the same time, and delivered to the custody of P. the trustee and residuary legatee therein named, with the injunction to take care of that will so that if the one in his own possession should be lost, he (P.) would know upón his death what to do. The paper among other things stated that P. would at the death of H. and his wife, distribute to certain enumerated persons the sum of money set out after each name. Three person named had no specific sum annexed to their names, but a blank space was left after each, which H. his attention being thereto particularly called by the draftsman of the paper, said, "could be filled up at any time, or something to that effect," This paper upon the death of H. was offered for probate by P. and annexed to it was a paper signed by the widow of H. in which she acknowledged that the paper offered for probate contained the desires and wishes, of her deceased husband in regard to the disposition of his property after his death, requested that the same might be admitted to probate and renounced her right to administer with the will annexed, in favor of P. The paper was admitted to probate and letters of administration c. t. a. were granted to P who gave bond and qualified according to law. Subsequently the widow filed a petition in the Orphans' Court praying that the matter of the probate might be again examined and heard according to the provisions of Art. 93, sec. 320, of the Code, and that the letters of administration c. t. a.

Harris *vs.* Pue, Adm'r *c. t. a.*

might be revoked. The petition alleged that the petitioner when she signed the paper filed with the alleged will, did so in the full trust and belief that said alleged will set forth the full testamentary scheme and purposes of her deceased husband, but that in this respect she was misled and misinformed; and she had since learned, and so averred and declared, that said paper did not contain the testamentary scheme or purposes of said deceased, in that it did not set forth the legacies or bequests which he intended to give to the persons mentioned, after whose names no amount was stated. The petition went on to state the specific amount which as alleged by the petitioner it was the intention of her deceased husband, to give to those persons respectively—which was well known to the petitioner, and which she believed was set forth in the alleged testamentary paper when she signed the paper filed therewith. P. fully answered the petition and testimony being taken on both sides, the Orphans' Court dismissed the petition. On appeal it was HELD:

That the paper writing was properly admitted to probate as a valid will; the existence of the blanks did not defeat the will, although the particular bequests being in blank, would fail for uncertainty; the other bequests being clearly expressed and being in no manner connected with or dependent upon those in blank, would have effect, it being the manifest intention of the deceased that the paper as it stood, should operate as his will.

APPEAL from the Orphans' Court of Howard County.

The case is fully stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BRENT, ALVEY and ROBINSON, J.

*George W. Sands* and *William M. Merrick*, for the appellant,

Argued that the probate should have been vacated, and the letters of administration revoked, because—

1st. The paper-writing is, upon its face, informal, imperfect, incomplete, and discloses, by its own terms, that it was not the deliberate final will or testamentary purpose of the deceased, but at best only the scheme of a will thereafter to be completed and settled.

2nd. That the mode of its execution, the manner of its custody, the place where it was found, furnish further and strong evidence that it was not considered by the testator as an important paper, and that it was not his will.

3rd. The parol testimony clearly establishes that the paper does not express the testamentary purpose of the deceased; but, on² the contrary, is utterly at variance with it.

4th. That for the maintenance of such a paper, so imperfect and defective, if capable of being set up in any event, the clearest and strongest evidence must be adduced to shew that the testator designed it to operate in its imperfect state.

5th. That in the present case, the paper being upheld only by the evidence of the largest beneficiary—a person who was in a situation to promote his own advantage, and who has so shaped the paper as to do so most completely, and to defeat the manifest settled purposes of the deceased; a witness surrounded with every legal ground of suspicion, and who not only is unsustained, but is contradicted, in one important particular certainly, by the positive evidence of an impartial witness—the proof is of too dangerous a character to be admitted to supply a testamentary scheme patently incomplete, and public policy, as well as all the probabilities of the case itself, require the rejection of the paper.

In support of the foregoing propositions the appellant referred to the following authorities: *Tilghman vs. Stewart*, 4 *H. & J.*, 156, 162, 166, 173; *Matthews vs. Warner*, 4 *Vesey*, 186, 197, 209–10; *Coles vs. Trecothick*, 9 *Vesey*, 249; 1 *Wm's Exrs*, 65; *Montefiore vs. Montefiore*, 2 *Addams*, 357; *Allen vs. Manning*, 2 *Addams*, 490, *and authorities in note (n;)* *Roose vs. Moulsdale*, 1 *Addams*, 129; *Plater vs. Groome*, 3 *Md.*, 135, 143; *Clagett vs. Hawkins*, 11 *Md.*, 381 *and* 387; *Barnes vs. Syester*, 14

*Md.*, 507, 527, 529 ; *Beaty vs. Beaty*, 1 *Addams*, 154 ; *Modern Probate of Wills*, 32, 39, 41, 47, 51, 56, 57 *and* 71 ; *Rochelle vs. Rochelle*, 10 *Leigh Va. Rep.*, 125 ; *Roberts on Wills*, 51, 53, 153, 154 ; 1 *Jarman on Wills*, 97, *marg. ; Williams' Exrs vs. Robinson*, 1 *American Reports*, 359 ; *Harvey vs. Sullens*, 46 *Mo.*, 147.

*Henry E. Wootton* and *Thomas Donaldson*, for the appellee.

The paper-writing in question is a valid will to pass personal property. The deceased, at the time of the execution of the same, was seized of no real estate, and it was only intended to operate upon personal property. No question is raised as to the testamentary capacity of the deceased, and the same is fully established by the testimony in the case. A will of personal property requires neither name nor signature. This paper was carefully examined by the deceased, and signed by him and declared by him to be his will ; a duplicate of the same was executed by the deceased at the same time, and committed to the custody of the appellee, the trustee under the will and the residuary legatee. The blanks do not vitiate a will if it comes clothed with the forms which the law requires. If the deceased had been possessed of real estate, and the paper had been executed agreeably to the Statute of Frauds, the blanks would not have defeated it as a will, although they would render three of the legacies void for uncertainty. *Tilghman vs. Stewart*, 4 *H. & J.*, 172.

But inasmuch as the paper-writing was intended to operate upon personal property only, the signing of the same, its execution in duplicate, and the delivery of the duplicate to the custody of his trustee and residuary legatee, as clearly evidence the *animum testandi* as though the same had been executed in the presence of three witnesses. The testimony shows that the appellant regarded

Harris *vs.* Puc, Adm'r *c. t. a.*

the paper-writing as the will of her husband, and was cognizant of its contents.

Did the deceased intend the paper-writing to be his will, notwithstanding the blanks? Although at the time he dictated the will he may have intended to have filled the blanks with specified sums, *he never did intend to die intestate if those blanks were never filled.* Why should the deceased have signed in duplicate a paper-writing and committed it to the custody of the appellee, if he deemed that paper, *as it then stood,* inoperative and valueless? The paper-writing admitted to probate is not unfinished and incomplete; the whole property is disposed of and a residuary legatee appointed. There was a suspended intention in regard to the amounts to be affixed to the first three named legatees at the time the deceased dictated the paper, but there was no suspended intention in regard to the paper being his will as it then stood, even though the amounts should never be affixed.

The rule is, that if the will, so far as it goes, imports undisputed bequests, and there is no reason to doubt that the testator intended such bequests at all events, they will not fail because he intended to make additional provisions, but died without executing such intention. *Swinburne on Wills,* 519 ; *Cogbill vs. Cogbill, et al.,* 2 *Henning & Munford,* 1517 ; *Popple vs. Cunison,* 1 *Ad.,* 377, *and* 2 *Eng. Ec. Rep.,* 141 ; *Rochelle vs. Rochelle,* 10 *Leigh,* 141 ; *Plater vs. Groome,* 3 *Md.,* 139.

Blanks in the paper-writing can have no other effect than to render the legacies void for uncertainty. They cannot vitiate the will. The specific legacies must take effect, and the appellee at all events is the residuary legatee, and such was the intention of the deceased, as is conclusively shown by the evidence. *Phillips vs. Chamberlain,* 4 *Vesey,* 53 ; *Habberfield vs. Browning,* 4 *Vesey,* 200, *(note;) Tilghman vs. Stewart,* 4 *H. & J.,* 170, *&c.; In the Goods of Pool,* 1 *L. R., Probate and Divorce,* 206.

BARTOL, C. J., delivered the opinion of the Court.

On the 18th day of February, 1873, the appellee filed in the Orphans' Court of Howard County, for probate, a paper-writing, as the last will of Christopher Harris, deceased, and at the same, time filed therewith a paper signed by the appellant as follows:

"I, Ann Harris, widow of Christopher Harris, knowing that the paper-writing signed in lead pencil by my said husband, and filed with the Register of Wills of Howard County, by Charles R. Pue, Jr., on the 18th day of February, 1873, embodies the desires and wishes of my said husband, in regard to the disposition of his property after his death, do hereby request that the same may be admitted to probate by the said Court, and I renounce my right to administration, with the will annexed, in favor of said C. R. Pue, Jr.

"Witness my hand, this 18th day of February, 1873.

ANN HARRIS."

"Witness:   JOSEPH HUNT,
    WM. H. SCOTT."

Whereupon the said Charles R. Pue, Jr., being examined on oath, touching the manner in which the said paper-writing or will, came into his hands and possession, and his answers being satisfactory to the Court, an order was passed admitting the same to probate without objection, and thereupon letters of administration, *c. t. a.*, were granted to the appellee, who gave bond and qualified according to law.

On the first day of April, 1873, a petition was filed by the appellant, praying that the matter of the probate be again examined and heard, according to the provisions of the *Code, Art.* 93, *sec.* 320, that the letters of administration, *c. t. a.*, be revoked and annulled, and for further relief. The petition alleges two grounds for relief.

*First,* That the petitioner, when she signed the paper filed with the alleged will, "did so in the full trust and

belief that the paper filed as the will of the deceased, set forth and contained the full testamentary scheme and purposes of her deceased husband, but in this respect she was misled and misinformed. And she has since learned, and avers and declares that said alleged testamentary paper does not set forth, or contain the testamentary scheme or purposes of her deceased husband; amongst other things in this, that it does not set forth and contain a legacy or bequest to the Rev. Hugh Griffin, of Howard County, of the sum of five hundred dollars. Also in this, that it does not set forth and contain a legacy or bequest to the Rev. Father Chappal, of St. Charles College, in Howard County, of the sum of two hundred dollars. And also, in this, that it does not set forth and contain a legacy or bequest to Hettie Shields, of Baltimore City, of the sum of one thousand dollars. All of which said legacies and bequests, the petition alleges, it was the settled testamentary scheme, purpose and disposition of the said Christopher Harris, to make, give and bequeath; all of which was, and is well known to her, and all of which she believed were set forth and contained in the alleged testamentary paper, when she signed the paper filed therewith."

*Second.*—The petition further alleges "that the Court had no rightful jurisdiction in the matter of probate, because the deceased at the time of his death, had no domicil in Howard County, and was not seized or possessed of any property real or personal within the limits of said County."

The appellee in his answer to the petition, states that the appellant had "full knowledge of the contents of the paper-writing admitted to probate, and that letters of administration *c. t. a.* were granted to him at her request and with her approbation. He avers that he knows of no other testamentary scheme or purpose of the deceased, except that contained in said paper; and submits that

any such testamentary scheme or purpose can only be evidenced in the manner required and designated under the laws of the State. That the said paper-writing was prepared by the respondent at the request and earnest solicitation of the said deceased, in the presence of the said deceased, and that the same was read over to the said deceased by the respondent, and after an examination of the same by the said deceased was signed by him. That a copy of the said paper was likewise prepared by respondent at the same time and place, that is on the 15th day of January, 1873, and in the room of said deceased; that the said copy was prepared at the instance and request of the said deceased, and examined by him and by him signed and delivered to the respondent, with the solemn injunction that the respondent should, after the death of said deceased, carry out the purposes of said deceased as set forth and contained in said papers; all of which was done in the presence and within the hearing of the petitioner.''

The answer further avers '' that the deceased was seized of no real estate at the time of his death, and his personal property amounted to the sum of $3800, evidenced and secured by the promissory note of *Col. M. Benzinger* of Baltimore City, in whose possession the said sum was at the time of the death of said deceased, and who still retains possession of the same; and the said deceased was likewise possessed of a few articles of household furniture of very small value, which he has delivered into the possession of the petitioner.

The answer avers that the deceased was at the time of his death a resident of Howard County, that he had resided therein for more than a quarter of a century, and always regarded the said County as his home; that at the time of his death, he had only been beyond the limits of the County for a short time and for a temporary purpose; and that the petitioner, the day the deceased was

buried, returned to said County, and has been in said County since residing," &c., and prays that the petition be dismissed, &c.

The case was set down for hearing, and testimony produced upon both sides ; and the Orphans' Court on the 19th day of June, 1873, ordered and adjudged that the petition be dismissed. From this order the present appeal was taken.

We have set out the averments contained in the petition and answer, at greater length than usual, in order that it may clearly appear what are the questions at issue between the parties, which we shall now proceed to consider.

As to the alleged want of the jurisdiction of the Orphans' Court.

This objection, though made in the petition, has not been pressed in the argument by appellant's counsel. It appears from the evidence that the deceased, had made his home in Ellicott's Mills in Howard County for some years ; a few months before his death, he and his wife went to Mr. John W. Jackson's in Baltimore County ; and remained there till his death. But the proof shows that the house of Mr. Jackson was regarded by the deceased only as a temporary home. He so stated to Dr. Burns his physician, who testifies that he always claimed Howard County as his place of residence, and expressed his intention to return there as soon as he could find a place. Similar expressions by the deceased as to his domicil are proved by Dr. Thomas Owings and Edward H. Soper. On this subject there is no contradictory proof. The jurisdiction being established, the only question to be considered is whether the paper-writing was properly admitted to probate, as a valid will to pass personal property ? The deceased at the time of its execution was seized of no real estate, and the instrument, therefore, could have been intended only to operate upon personal property.

It was executed on the 15th day of January, 1873, and Mr. Harris died on the 13th day of February following; there is no question as to his testamentary capacity, though eighty-six years old, he appears to have retained his faculties unimpaired. Dr. Watkins, who saw him not more than two or three weeks before his death, testifies that "he was then of sound and disposing mind;" and Dr. Burns, who attended him in his last sickness, says, "he was of clear, strong mind; even in his last illness he was of clear mind; he was of sound and disposing mind up to the last moment I saw him; I never saw him otherwise than of sound mind."

The paper admitted to probate is as follows:

"ELLICOTT CITY, *Jan.* 15th, 1873.

"Charles R. Pue will, at the death of myself and wife, distribute to each of the undersigned persons, the sums of money stated after each name, to-wit:

"To Rev. Father Griffin, ——;
" " " Father Chappal, ——;
" " Hetty Shields, ——;
" " Mrs. Phelia Kennedy, one hundred dollars.
" " St. Joseph Orph. Asylum, (Franklin Square,) two hundred and fifty dollars, ($250 00.)

"The amounts to be written hereafter to each of the three above named persons.

"Chas. R. Pue, Jr., to bury us and to see that all debts for funeral expenses be paid first, then to pay the above, and all money remaining thereafter to be kept for himself. Should I die first, Chas. R. Pue is requested to take charge and look after my wife's welfare. Col. Benzinger will pay C. R. Pue, Jr., all money in his hands belonging to me at my death.

"CHRISTOPHER HARRIS."

(Signed in lead pencil.)

Charles R. Pue, Jr., states in his testimony that the paper was written by him, on the request and at the

dictation of Mr. Harris; that he was sent for on that day by Mr. Harris, and went immediately; on arriving at the house he met Mr. and Mrs. Harris, (the appellant,) and while they were yet standing together, Mr. Harris took out of his inside coat-pocket two sheets of paper, saying at the same time, "Come, Charley, I want you to write my will now;" then asked for pen and ink, which were brought, then, after trying if he could write his name with a pen, and failing, because the pen caught in the paper, the witness remarked that he could sign with a pencil. The witness, after dating the paper, proceeded to write, word for word, as dictated to him by Mr. Harris, until he had written the $250 to the St. Joseph's Orphan Asylum; when Mr. Harris went on to give further directions, and the witness thinking he had overlooked the three blanks, asked him if he was not going to fill them up; he replied, "that could be done at any time," or something to that effect, saying, "I don't know what amount I will leave them; I am going to take care of you, and I don't want to lessen that amount;" the witness then wrote the words, "The amounts to be written hereafter to each of the three above named persons." Mr. Harris then went on and finished dictating the will. The witness then read it to him, and asked him if it was right? he said it was; then the paper was handed to him requesting him to read it himself. He then took the paper up in his hand, and pointing to the other sheet of paper, said, "write me one after this," referring to the paper he had in his hand. The witness asked him what he wanted with two wills, he said that he lost one, it had been destroyed on him, and he would keep one himself, and wanted witness to keep the other, so that if the one he had was lost, the witness would know, upon his death, what to do. While he was reading the paper he had in his hand, witness went on to write one just like the one he was reading, from memory. After he had

finished reading, witness compared them and found he had omitted "Col. Benzinger will pay to Charles R. Pue all money in his hands at my death belonging to me." These words were added. He then signed the papers. The witness then folded and put the paper he had last written in his pocket; Mr. Harris took the one first written and put it in his pocket. When the witness was taking leave of him he said to witness "*keep that will safe.*"

The witness testified that the signature to the paper admitted to probate is the signature of the deceased, that he saw him sign the same.

The duplicate paper was produced by the witness, also signed by Christopher Harris, in lead pencil. The papers are precisely of the same import, and almost literally the same.

These are the circumstances attending the execution of the paper as testified by Charles R. Pue, Jr.

From this testimony it appears that the will was written at the request, and by the dictation of Mr. Harris, and was signed by him in the presence of Mrs. Harris, the appellant.

These facts do not rest entirely upon the evidence of Charles R. Pue, Jr., but in many particulars are corroborated by the testimony of other witnesses, who are disinterested.

Dr. Burns, the attending physician, testifies that in January, Mr. Harris told him in the presence of Mrs. Harris, that "he intended to send for Charley to fix up his affairs," that knowing it would be Mr. Harris' last illness; witness afterwards reminded Mrs. Harris of the conversation of Mr. Harris with witness, (in her presence,) about sending for Charley and making his will; and she replied "that Charley came out the next day and made the will, and that every thing was in Charley's hands," that both Mr. and Mrs. Harris in speaking of

Charles R. Pue Jr., always called him "Charley." The same witness testifies that on the Monday after Mr. Harris' death, when Mrs. Harris, (the appellant,) was at Mrs. Heavy's, she sent for witness and told him "to make out his bill and send it to Charley, that every thing was in Charley's hands."

This evidence conclusively proves, that the appellant was cognizant of the making of the will, and confirms the testimony of Charles R. Pue, that it was written and executed in her presence. There is another fact which shows her knowledge of the existence of the will. Alfred W. Pue, a disinterested witness, who was present when the will was found, states that he went with his brother Charles to Mrs. Heavy's, where Mrs. Harris was staying, and his brother stated to Mrs. Harris, "that the will was not found in the trunk where she said it was, but was found by mere accident in the bureau drawer, she replied, "*oh! I put it there and forgot it.*"

Mrs. Harris, in her evidence, states that she had never seen the will, and makes many other incoherent and contradictory statements, both with regard to the will, and the paper signed by her and witnessed by Hunt and Scott. But an examination of her evidence demonstrates that either from her extreme age, or her feeble health, her memory is altogether unreliable.

The facts to which we have adverted, prove that the paper was executed by Christopher Harris, at the time and in the manner testified to by Charles R. Pue, Jr.

The petition does not allege that the signature thereto is not the signature of Christopher Harris, and in addition to the positive testimony of Charles R. Pue, Jr., the genuineness of the signature is proved by several witnesses.

The paper remained in the possession of Mr. Harris, and in the afternoon of the funeral, was found in the room which had been occupied by him in the house of Mr. Jackson.

Upon this state of facts, the question whether the paper was properly admitted to probate, would seem to be of easy solution.

As said by Judge BUCHANAN in *Tilghman vs. Stewart,* 4 *H. & J.,* 173, "to constitute the paper a will, it must appear that the deceased possessed *animum testandi,* at the time it was written ; and that he intended the paper as it stood to be his will, without looking to any thing further to be done in order to perfect it." That is to say, if the deceased intended the paper in its present form, as dictated and signed by him, to operate as his will, notwithstanding the blanks; then it is a good and valid will of personal property. In such case the existence of the blanks does not defeat the will ; although the particular bequests to *Father Griffin, Father Chappal* and *Hettie Shields* being in blank, must fail for uncertainty ; the other bequests being clearly expressed, and being in no manner connected with, or dependent upon those in blank must have effect, if (as we think there is no reason to doubt,) such was the intention of the testator. This rule is clearly stated by all the judges in *Tilghman vs. Stewart,* 4 *H. & J.,* 156. In this case the blanks have no significance or effect, except as some evidence tending to show that the deceased might have considered the paper as an unfinished and incomplete act, and might not have intended it to operate as a will until the blanks were filled up.

But the proof in our opinion clearly shows that the deceased intended the paper as it stood, to operate as his will. No doubt at the time he dictated the will, he had an undefined intention of filling the blanks with some specific sums before his death ; but it is very evident from all the proof in the case, that "he did not intend to die intestate, if the blanks were never filled." The paper is not unfinished and incomplete, it disposes of his whole property, and names the residuary legatee. It was signed

by the testator, a duplicate was prepared at his request, signed by him, and delivered into the custody of Charles R. Pue, with the injunction *to take care of that will,* "*so that if the one in his own possession should be lost, he,* (Charles R. Pue,) *would know upon his death what to do.*" It is impossible to construe these acts of the deceased in any other way, than as expressing his settled purpose and intention that the instrument as executed, should operate as his will.

If to these be added the facts proved by Dr. Burns, to which we have before referred, that the deceased declared to him, in the presence of Mrs. Harris, his intention to send for Charles R. Pue to fix up his affairs; and that Mrs. Harris informed him afterwards, that Charles R. Pue had " been out the next day and made the will, and that everything was in Charley's hands." And the further fact that the paper was kept unaltered in the safe custody of the deceased until his death ; the conclusion is, in our judgment, irresistible that the deceased intended the paper as it stood to operate as his will ; and that it was so regarded by the appellant.

In the consideration of this case, we have referred to the testimony of Charles R. Pue, as establishing many of the facts upon which the validity of the will depends. Although a beneficiary under the will, he is made by the *Act of* 1864, *chap.* 109, a competent witness to sustain it; as was decided at the last term in *Estep vs. Morris,* 38 *Md.,* 417.

That decision was the necessary result of the broad and comprehensive terms of the Act of Assembly. It seems to us, however, that it would be eminently wise and expedient for the Legislature, so to amend or modify the Act, as to except from its operation parties who may be interested as beneficiaries under a will, and render them incompetent as witnesses to prove the same. Reason and good policy demand that there should be thrown around

such instruments, the safeguard and protection which may be secured by requiring that they shall be evidenced by the testimony of disinterested witnesses.

As the law now stands, Charles R. Pue is a legal and competent witness, and his testimony is entitled to be considered by us in forming our conclusions upon the case.

There is much force in the argument of the appellant's counsel, that upon principles of public policy, where a testamentary paper has been prepared by a party, who is the principal beneficiary under it, and is supported by his own testimony, the utmost care should be observed, and the circumstances attending the preparation of the paper ought to be free from every ground of doubt or suspicion of fraud or unfairness. In the present case, however, no fraud or undue influence on the part of the appellee is charged or suggested in the petition; nor is there in the testimony any ground for such a charge. The paper was not prepared in secret; but in the presence of the appellant, in the very words dictated by the testator, at a time when he was in the full possession of his faculties; was signed by him after he had carefully read it; kept in his possession, and after his death found in the place where the appellant herself had put it, *as his will.*

A good deal of evidence was produced, with regard to the various and changing purposes expressed by the testator during his life, as to his intentions of disposing of his property; and proof was offered of several wills which had been made by him, in one of which, nothing was given to the appellee.

It is very obvious that this proof cannot affect or impair the validity of the paper before us; if as we have said, it is clear from the whole evidence, it was executed by him as his last will, and was intended by him so to operate. It appears from the proof that between him and the appellee there existed the closest and tenderest relations, that the appellee had been taken in his infancy into

his family, and reared by him and Mrs. Harris, who were childless, as if he had been their own child. That the testator had set him up in business, and always spoke of him as "his boy," and expressed a just pride in his respectability and his success in life. These feelings towards the appellee, both on the part of Mr. and Mrs. Harris, continued up to the time of his death, as proved by several witnesses, especially by the physicians, and the nurse, and others who had the best opportunity of knowing his real sentiments towards the appellee; and although other witnesses have testified that he sometimes said he had done enough for Charley, and would give him nothing more; it is evident that such expressions proceeded from mere momentary feelings of pique, on account of some fancied slight or neglect on the part of the appellee, who continued to be the chief object of his confidence and affection, and of this the will before us was the most natural expression.

Being satisfied after a careful examination of the case, that the paper was properly admitted to probate as the last will of Christopher Harris, the order of the Orphans' Court will be affirmed.

*Order affirmed.*

(Decided 20th February, 1874.]